[Civ. No. 1961.    First Appellate District.—July 2, 1917.]

## W. C. THOITS et al., Petitioners, v. J. F. BYXBEE, Jr., as Superintendent of Streets of the City of Palo Alto, Respondent.

MANDAMUS—STREET IMPROVEMENT CONTRACT—EXECUTION BY SUPERIN-
TENDENT OF STREETS.—*Mandamus* will lie at the instance of property owners to compel a city superintendent of streets to enter into a contract with the successful bidder for street work to be done under the Vrooman Act.

ID.—DISTRICT ASSESSMENT—PROPERTY TO BE ASSESSED—MAP—SUFFI-
CIENCY OF RESOLUTION OF INTENTION.—Proceedings for street improvement taken under the Vrooman Act, as amended in 1913, declaring that the city council may make the expenses of the work chargeable upon a district, and that the resolution of intention shall in general terms describe the district and make reference to a plat or map approved by the city council, which shall indicate by a boundary line the extent of territory to be included, and also taken under the Improvement Act of 1915, providing that the city council shall declare in its resolution of intention the exterior boundaries of the district the property within which is to be assessed to pay the costs and expenses of the work, are not invalid, because the map of the district to which the resolution of intention referred contained a legend stating that the property colored in red was the property affected, since such statement was not a declaration that other property included within its boundaries was not benefited and would not be assessed.

ID.—SPECIFICATIONS—CONCRETE—RIGHT OF SUPERINTENDENT TO CHANGE
PROPORTIONS OF SAND AND ROCK.—Proceedings taken under such acts are not invalid because the specifications with reference to the concrete to be used authorized the superintendent to change the proportions of sand and rock and determine the number of revolutions of the drum for mixing each batch of concrete.

ID.—EXECUTION OF CONTRACT—MANDAMUS BY PROPERTY OWNER—DE-
MAND.—The duty of a city superintendent of streets to execute a contract for street work is a public duty, and no demand by property owners is required as a condition precedent to their right to compel such execution by writ of mandate.

ID.—PROPERTY OWNERS PARTIES INTERESTED.—Owners of lots that are to be improved under a street contract are sufficiently beneficially interested in the contract to petition for a writ of mandate to compel its execution by the superintendent of streets.

APPLICATION for a Writ of Mandate originally made to the District Court of Appeal for the First Appellate District

to compel a superintendent of streets to enter into a contract
for street improvement.

The facts are stated in the opinion of the court.

Norman E. Malcolm, and Kirkbride & Gordon, for Peti-
tioners.

Raymond Benjamin, and Frederick Schneider, for Inter-
veners.

Earl D. White, for Respondent.

THE COURT.—This is a proceeding in *mandamus* brought
by petitioners, owners of certain lots in the city of Palo Alto,
included, among others, within a project of street improve-
ment, against the superintendent of streets of said city, to
compel him to enter into a contract with the successful bidder
for said work.

Other property owners intervened in the suit and joined
with the respondent in resisting the demand of the petitioners
that said respondent be compelled to enter into such contract.

Issues of fact being raised by the pleadings, the matter was
by this court referred for the taking of testimony and the
making of findings thereon. The referee has made his re-
port and the same is hereby adopted.

The respondent and interveners raise various points which
they urge as grounds for denying the relief sought, the first
of which is, stated in the language of one of the interveners,
that "the present *mandamus* proceedings cannot be used to
test the validity of the proposed contract or the validity of the
street work proceedings already had," for the alleged reason
that the respondent, as superintendent of streets, acts purely
in a ministerial capacity in executing a contract with the suc-
cessful bidder for street work to be done under the provisions
of the so-called Vrooman Act, and that if he refuses to per-
form such duty, there is a direct remedy at hand by his re-
moval from office and the appointment of another person who
will not refuse to do his duty.

In support of this contention the cases of *City of Los
Angeles* v. *Lelande,* 157 Cal. 30, [106 Pac. 218], and *Marin
Municipal Water Dist.* v. *Dolge,* 172 Cal. 724, [158 Pac. 187].

are cited. In those cases, however, the officer whose action was sought to be compelled was under the direct authority of the board or corporation asking for the writ of *mandamus;* and it appearing to the court in those cases that the object of the proceedings was simply to get the opinion of the court upon the validity of proceedings in which the particular act sought to be compelled was an incident, and that there was no real controversy between the parties to the proceeding, it denied the relief sought.

We think those cases have no application here. The petitioners in this case have no authority over the respondent, nor have the interveners; and the controversy—to judge by the earnestness of opposing counsel in urging their contentions upon this court—is a very real one. Moreover, it cannot be said that the duty of the respondent to enter into the contract here involved is purely ministerial.

The next contention in opposition to the issuance of the writ is that the proceedings taken thus far in the matter of the street improvement are invalid because not based on any valid resolution of intention. It is alleged that the resolution of intention is ambiguous and fails to show the district to be assessed for the cost of the work.

These proceedings are taken under the Vrooman Act and the Improvement Bond Act of 1915 [Stats. 1915, p. 1441]. Section 3 of the former act (Stats. 1913, p. 402) declares that the "City council may make the expense of such work or improvement chargeable upon a district, which said city council shall, in its resolution of intention, declare to be assessed to pay the costs and expenses thereof. Said resolution of intention shall in general terms describe the said district and refer to a plat or map approved by the city council, which shall indicate by a boundary line the extent of the territory to be included in said assessment district which plat or map . . . shall govern for all details as to the extent of the said assessment district."

Section 4 of the Improvement Bond Act of 1915 provides: "The city council shall also declare in said resolution of intention the exterior boundaries of the district, the property within which is to be assessed to pay the cost and expenses of said work."

In the resolution of intention adopted by the council it is declared "that said proposed work and improvements are of

more than local or ordinary public benefit, and affect and
benefit the lands and district hereinafter described, which
said district is hereby declared to be the district benefited by
said work and improvements, and to have the exterior bound-
aries hereinafter described as the boundary thereof.    That
therefore the entire cost and expenses of said work and im-
provement shall be and are hereby made chargeable against
and shall be assessed upon said lands and district, which dis-
trict is within the city of Palo Alto, county of Santa Clara,
state of California, and is particularly bounded and described
as follows:'' Then follows a description of the exterior bound-
ary of said district.

In said resolution of intention the council also referred to
the plan and diagram of the district made by the city engi-
neer, which showed the extent and boundaries of said district,
and which by said resolution it adopted.

The point of attack on this resolution of intention is that it
creates an assessment district, describes its boundaries, refers
to a map thereof, and that said map shows that it includes
therein property that is not to be assessed.    From an exam-
ination of the map, however, we think no such conclusion can
be drawn from it.    In addition to the boundary line of the
district the map shows in detail the streets to be improved
colored in yellow, the property abutting on those streets
colored in pink, and other streets already improved and upon
which no work is to be done under this resolution.    A legend
on the map states that the property colored in red is the prop-
erty ''affected''; and from this the interveners argue that the
map thus shows that only the property so colored in red is to
be assessed.    But the statement in the legend on the map that
the property colored in red is the property affected is by no
means a declaration that the remaining property is not bene-
fited and not to be assessed; and the plain declaration in the
resolution of intention itself is that all the property included
within the district will be subject to assessment.    As the as-
sessment must be according to benefits, it is evident that the
property which is stated in the map to be ''affected'' will bear
a higher assessment than the property not so colored.    We
think it clear that the word ''affected'' as used in the legend
on the map merely means that such property is directly adja-
cent to the proposed work.    The resolution of intention, there-
fore, is not invalid for the reason urged.

The next point of invalidity alleged is that no official grade has been established in Palo Alto. On this point the finding of the referee is "that at all of the dates and times mentioned in the petition, all these portions of those certain streets in the city of Palo Alto described and mentioned in the resolution of intention hereafter referred to were open and located streets in the said city of Palo Alto, dedicated to public use, with established grades and width, and that the official grades thereof were established by the board of trustees of the town, not the city, of Palo Alto by resolution of the board of trustees of said town adopted July 7, 1900, wherein said board of trustees resolved: 'That the grades of the town of Palo Alto be and they are hereby established as shown on the map entitled: Map showing the established grades for the town of Palo Alto, prepared by C. E. Moore, and that all sidewalks and street improvements conform thereto.'" The referee further found that the board of town trustees of Palo Alto adopted a map prepared by the town engineer showing bench marks and monuments, which map was introduced in evidence. The grade map shows that there are certain elevations marked upon every street intersection upon the map, and that C. E. Moore, the civil engineer who prepared the map, placed corresponding marks and figures for elevations upon hydrants and manholes in various parts of the city, and notably upon a rail in the circle of Palo Alto, so that any engineer could take this grade map, together with the monuments established at various places in the city, and determine the exact grade of streets at any given point.

The objection that the figures do not specify inches, feet, or miles, or whether above or below sea-level, is not serious. It is matter of common knowledge that in this part of the state elevations are above sea-level (*Federal Construction Co.* v. *Wold,* 30 Cal. App. 360, 363, [158 Pac. 340]), and are indicated in feet.

It is next contended that the street proceedings taken in this case are invalid because not authorized by the charter of Palo Alto. It is argued that the proceedings should have been taken under the general laws of the state as they existed in 1911, because in section 10 of the charter of Palo Alto as amended in 1911 it is provided that "In the erection, improvement and repair of all public buildings and works, in all street and sewer work, done under and by authority of the

laws of the state of California creating a bonded indebtedness of the municipality, or done under and by authority of any of the street laws of the state of California, which laws are hereby made a part of this charter, the work shall be let to the lowest bidder. The council shall have power to adopt ordinances for the purpose of carrying out these provisions, and such ordinances shall be supplemental to the existing laws of the state. . . . ''

By this section the general street laws of the state are adopted as a part of the charter of Palo Alto. Such adoption is not to be confined to the particular laws existing at the date thereof. The rule of statutory construction with regard to the adoption of statutes by reference is thus stated in 2 Sutherland on Statutory Construction, second edition, page 787: ''Where one statute adopts the particular provisions of another by specific and descriptive reference to the statute or provision adopted, the effect is the same as though the statute or provision adopted had been incorporated bodily into the adopting statute. When so adopted only such portion is in force as relates to the particular subject of the adopting act and as is applicable and appropriate thereto. Such adoption takes the statute as it exists, and does not include subsequent additions or modifications of the statute so taken unless it does by express intent. When, however, the adopting statute makes no reference to any particular act by its title or otherwise, but refers to the general law relating to the subject in hand, the reference will be regarded as including not only the law in force at the date of adopting the act, but also the laws in force when action is taken or proceedings are resorted to.''

Nor can the word ''existing,'' found in the last clause of the section quoted, have the effect of taking this case from the general rule. The word is used in connection with the power given to the council to enact ordinances relating to street matters, and declares that such ordinances when enacted shall be supplemental to existing laws, that is, supplemental to the laws existing when such ordinances shall be enacted. We can discover no intention from the use of this language to confine the adoption of the general laws of the state relating to street improvement to the particular laws existing at the time of the enactment of this section; and the reason for making such an adoption is equally applicable to general laws later enacted which come within the description employed.

The next objection to these proceedings is that they are invalid "because the specifications do not definitely inform the owners of the work to be done, and vest in the superintendent of streets an illegal discretion to favor or injure the contractor." This objection is aimed at the following specifications (speaking of the concrete to be used in the work):

"It shall be composed of Portland cement, sand and broken rock, mixed ordinarily in the proportions of one cubic foot cement to two cubic feet of sand and four cubic feet of broken rock. A change may be made in the proportion of sand and rock in the concrete aggregate as the street superintendent may direct when in his opinion the voids in the material used are not satisfactory for mixing in the above proportions."

"The number of revolutions of the drum for mixing each batch of concrete shall be as determined by the street superintendent."

As against the validity of the first of these provisions of the specifications it is urged that the superintendent of streets is given such wide power to change the proportions of sand and rock in the concrete aggregate that the cost of the work could be materially increased or decreased by the superintendent, thus rendering favoritism or oppression on the part of the superintendent possible, and introducing such uncertainty into the specifications as to compel bidders for the work to name a higher price than they otherwise would, to the detriment of the property owner paying for the work.

The evidence taken in this case shows that by employing the sand and rock ordinarily used in the vicinity of Palo Alto for the character of work to be done under these proceedings, the prescribed mixture of one cubic foot of cement to two cubic feet of sand and four cubic feet of broken rock will make a concrete of proper density, and that the faculty given to the street superintendent of changing the proportions of sand and rock in the concrete aggregate is for the purpose of preserving this density of character. It also appears that the cost of sand and broken rock around Palo Alto is practically the same, so that a change in the proportions of those elements would not affect the cost of the work so far as those ingredients are concerned; but might affect it by increasing or decreasing the quantity of cement required in the making of the concrete. Thus if the rock furnished should show a materially larger percentage of voids than the average, that condition

could be corrected by increasing the proportion of sand, with a resultant increase in the area covered by the mixture thus produced; the amount of cement added to the newly determined proportions of sand and rock not being changed less cement would be required for the entire work, which might result in a considerable saving to the contractor. On the other hand, if the rock furnished should show a materially smaller percentage of voids than the average, that condition could be corrected by decreasing the proportion of sand, with a resultant decrease in the spread furnished by such mixture and a consequent increase in the quantity of cement used, entailing a greater outlay on the part of the contractor.

It is argued that in the presence of such possibilities under the specifications upon which the bids were to be made the contractor, in order to guard himself from loss, would necessarily name a higher price.

As against this view it was shown that if the contractor furnished uniformly graded rock, as required by another of the specifications for this work, the variation in the voids would be negligible, so that it would be unnecessary for the street superintendent to exercise the power in question. Witnesses testified that if this power were not given to the superintendent, he would be compelled, in order to preserve the required quality of density in the concrete, to insist upon a rigid adherence to the requirement of uniform grading in the rock—a condition much more onerous upon a contractor than compliance with the superintendent's directions to change the proportions of sand and rock for the purpose of filling voids; and that this discretion allowed to the superintendent was a positive advantage to the contractor. It was also testified that a contractor in preparing his bid upon such a specification either would not give it any consideration, or would regard it as a desirable element, and would not increase his bid on account of its presence. One of the witnesses produced in opposition to the specification testified that he himself prepared the figures of one of the competitors for this work, and that he did not take this provision of the specification attacked into consideration.

Expert evidence as to the construction of this specification in the shape of testimony of engineers was also introduced. The preponderance of this testimony showed that the correct construction thereof is that since only a change in the propor-

tions of sand and rock is permitted, the proportion of cement to the whole must be maintained, and it is found by the referee that this result can be readily effected; that if it should be desirable to increase the proportion of sand to rock, and at the same time maintain the constant of one part of cement to six parts of concrete aggregate in the mixture, it could readily be done by making the change not in one only of those ingredients, but in both, i. e., increasing the sand and decreasing the rock:

We think, moreover, that this last method is the one required by a natural construction of the language of the specification. Bearing in mind that a mixture of one part of cement to two parts of sand and four parts of rock has been prescribed, and that a change is permitted in the proportions of only two of those ingredients, we think it follows that the change must be made, if possible, without affecting the third proposition. We have seen that this is not only possible, but very easily accomplished, by varying the quantity of both the sand and the rock instead of confining the change to one of those ingredients.

Even if this construction be not the correct one, it is still apparent that the discretion given to the street superintendent under this specification is for one purpose only, viz., for filling voids in the concrete aggregate, and that the occasion for the exercise of this limited discretion is in the hands of the contractor, who can practically obviate its exercise by supplying rock uniformly graded as required by the specification.

For these reasons we think that this alleged ground of invalidity must be rejected.

As to the discretion given to the superintendent to prescribe the number of revolutions of the drum of the mechanical mixer, the evidence showed that the presence of this provision in the specification would not introduce any material uncertainty in the cost of the work. The number of revolutions of the drum bears principally upon the question of time employed in the work. The testimony showed that there is an average number of revolutions which is practically standard, and that if this number should be somewhat increased, the drum could be speeded up, and thus no difference in time result. Moreover, this discretion is not greater than that conferred upon the superintendent expressly by the Vrooman Act itself, wherein, in section 2 thereof, it is provided that the

work must be done under the direction and to the satisfaction of the superintendent of streets. We think this clause clearly broad enough to vest in him the authority to prescribe the number of revolutions of the drum when exercised within the other requirement of this specification that the concrete mixture shall have a uniform consistency and color.

It is next urged as going to the invalidity of the proceedings attacked that the award of the contract is invalid "because the lowest bidder was given no notice that his responsibility was in issue, nor was he accorded a hearing upon that point."

The evidence shows that one F. R. Ritchie was the lowest bidder, and that he was present at the meeting of the council when it publicly opened, examined, and declared the bids, and was present at the meeting at which the contract was awarded; that members of the council and other officers of the municipality made an investigation concerning the financial responsibility of Ritchie, and reported to the council that the Ritchie Company had failed to perform a contract for the construction of a portion of the state highway of the state of California, and that the bondsmen of said concern had been compelled to complete the same; that Ritchie was in fact the Ritchie Company; that he was given a hearing by the council at the meeting at which the contract was awarded, at which time he refused to answer questions asked by members of the council, and declared that he would refuse to answer any and all questions asked him by members of the council until he could be represented by an attorney. After considering the reports and acting upon advice the council found that F. R. Ritchie was not the lowest responsible bidder, and awarded the contract to the lowest regular responsible bidder—Paul & Caldwell.

The finding of the council, in the absence of fraud and collusion (neither of which was alleged nor claimed in this proceeding) is conclusive. (*Butler* v. *Printing Commrs.*, 68 W. Va. 493, [38 L. R. A. (N. S.) 653, 70 S. E. 119]; 3 McQuillin on Municipal Corporations, sec. 1228.)

It is next claimed that the petitioners are not entitled to the writ of *mandamus* "because there was not a demand and refusal."

In this case the contract executed by the firm to which it was awarded is in evidence, together with a proper bond. Demand was made upon the respondent to execute the contract

by said firm, and was refused. So far as the petitioners are concerned, the duty of the respondent to execute the contract was not one owing specifically to them, but was a public duty. Under such circumstances we think a demand from the petitioners was unnecessary. (*Wilson* v. *Board of Directors,* 138 Cal. 67, [70 Pac. 1059].)

It is finally urged as a reason why the writ should be denied that the petitioners are not beneficially interested in the contract the execution of which is sought to be compelled.

Section 1086 of the Code of Civil Procedure provides that the writ of mandate shall issue only on the petition of the party beneficially interested. While it may be true that the successful bidders have a greater interest in the signing of this contract by the respondent than have the petitioners, yet the beneficial interest of the latter is undeniable, since they are the owners of lots that are to be improved under the contract. We think the interest of the petitioners here is just as certain and direct as that of the petitioner in the case of *Eby* v. *School Trustees,* 87 Cal. 166, [25 Pac. 240]. That was a proceeding to compel the school trustees to proceed to reconstruct a schoolhouse on an old site, and the interest of the petitioner was that of a resident elector having a family of minor children.

This disposes of the questions raised in opposition to the issuance of the writ.

It is ordered that said respondent J. F. Byxbee, Jr., as superintendent of streets of the city of Palo Alto, forthwith sign and execute the contract with Paul & Caldwell referred to in the petition herein, and fix a date for the commencement of the work to be done under said contract, and that the petitioners recover their costs.

A petition for a rehearing of this cause was denied by the district court of appeal on August 1, 1917.