CORN EXCHANGE SAVINGS BANK, Appellant, v. SMITH, et al, Respondents.

(239 N. W. 186.)

(File No. 7166. Opinion filed November 10, 1931.)

*Roy E. Willy,* of Sioux Falls, and *M. G. Luddy,* of Los Angeles, Cal., for Appellant.

*M. Q. Sharpe,* Attorney General, *R. F. Drewry,* Assistant Attorney General, and *T. B. Thorson,* Special Counsel, of Pierre, for Respondents.

CAMPBELL, J. The instant case presents for the consideration of the court another angle of the Bank Guaranty Fund Law of this state (originating as Article 3, c. 102, Laws 1915) which has been many times before this court in various phases, and the history of which is considered at some length in State ex rel. Attorney General v. Smith (1931), 58 S. D. 22, 234 N. W. 764.

We have here a question not previously before this court relative to the amount of contribution to the guaranty fund properly to be required under the law in the case of a state bank chartered and commencing operations after the Guaranty Fund Law had been for some time in operation, and at a period when, as a matter of fact, the guaranty fund was actually and hopelessly insolvent. The material portions of the law are those relating to the establishment and maintenance of the fund, and the admission of new banks thereto.

The law concerning the creation and maintenance of the fund originated as section 8, art. 3, c. 102, Laws 1915, the portion of which, here material, was as follows:

"§ 8. Filing Statements—Assessments. On the first day of January, 1916, and on the first day of January of each year thereafter every bank engaged in the business of banking in this state shall make and file with the Depositors' Guaranty Fund Commission, a statement in writing, verified by the oath of its president, vice-president or cashier, showing the average daily deposits in its banks for the preceding twelve months.

"On the first day of the month next succeeding the date fixed for the making and filing of such statement, the Depositors' Guaranty Fund Commission shall levy assessments against the assets of each of said banks as follows:

"On the first of February, 1916, one-fourth of one per cent on the average daily deposits as shown by the first statement of such average daily deposits required to be made and filed by the provisions of this· section.

"On the first day of February of each and every year thereafter, one-fourth of one per cent of the average daily deposits as shown by the statements required to be made and filed on the first day of January in each year, until the total amount of money in the Guaranty Fund reaches one and one-half per cent of the average daily deposits.

"Due and legal notice of such assessment shall be deemed to have been given when such notice as shall be prepared by the secretary of the commission has been placed in an envelope, securely sealed, postage prepaid, directed to each of said banks and deposited in the United States mail.

"Provided, that when the Depositors' Guaranty Fund reaches the total sum of one and one half per cent of the average daily deposits, said assessment against the assets of said banks shall cease until such time as the Guaranty Fund is depleted below one per cent of the average daily deposits, when the necessary assessments may again be levied at one-fourth of one per cent per annum until said fund again reaches one and one-half per cent of the average daily deposits."

This section with some changes was placed by the Code commission in the Revised Code of 1919 as Section 9011, but before the effective date of the Revised Code, the same session of the Legislature, by chapter 122, Laws 1919, amended section 9011 of the Code so that the provisions of the original act above quoted were immediately succeeded, in effect, by the provisions of chapter 122, Laws 1919, reading as follows:

"On the first day of January of each year every bank engaged in the business of banking in this state shall make and file with the depositors' guaranty fund commission a statement in writing, verified by oath of its president, vice president or cashier, showing its average daily deposits for the preceding twelve months; and on the first day of the month next succeeding the day fixed for the making and filing of such statement the depositors' guaranty fund commission shall levy assessments against the assets of each of said banks as follows: On the first day of February of each and every year one-fourth of one per cent of the average daily deposits as shown by these statements required to be made and filed on the first day of January of each year until the total amount of money in the guaranty fund reaches one and one-half per cent of the average daily deposits. Due and legal notice of such assessment shall be deemed to have been given when such notice as shall be prepared by the secretary of the commission has been placed in an envelope, securely sealed, postage prepaid, directed to each of such banks and deposited in the United States mail.

"Provided, that when the Depositors' Guaranty Fund reaches the total sum of one and one-half per cent of the average daily deposits, said assessment against the assets of said banks shall cease until such time as the Guaranty Fund is depleted below one per cent of the average daily deposits, when the necessary assess-

ments may again be levied at one-fourth of one per cent per annum until said fund again reaches one and one-half per cent of the average daily deposits."

The original provision with reference to the admission of new banks under the operation of the guaranty fund was found in Section 12, art. 3, c. 102, Laws 1915, reading as follows.

"§ 12. New Banks. Any bank organized subsequent to January 1st, 1916, shall pay into the Depositors' Guaranty Fund an amount equal to four per cent of its capital stock, when such bank opens for business, which amount shall constitute a credit fund, subject to adjustment on the basis of said bank's average daily deposits as shown by the first annual statement required by section eight of this Article.

"The Depositors' Guaranty Fund Commission is authorized and empowered to make an adjustment of the rates of assessment to be paid by any bank which engages in the banking business subsequent to January 1st, 1916, and shall require such bank to contribute to the Depositors' Guaranty Fund, a just and equitable sum, and the Depositors' Guaranty Fund Commission shall adjust assessments of such bank so that the first two assessments, together with the credit fund of four per cent of the capital stock paid by said bank when it begins business, shall at least equal one per cent of the average daily deposits of said bank as shown by the first annual statement required by Section three of this article.

"Provided, however, that said four per cent will not be required of new banks formed by the reorganization or consolidation of banks that have previously complied with the terms of this Act with reference to the payment of assessments."

This section with some modification was placed by the Code commission in the Revised Code of 1919 as section 9016, but here again, prior to the effective date, the section was amended by chapter 123, Laws 1919, so that, as a matter of fact, the provision of the original act was immediately succeeded by said chapter 123, Laws 1919, which reads:

"Any bank hereafter organized shall pay into the Depositors' Guaranty Fund an amount equal to 4% of its capital stock when such bank opens for business, which amount shall constitute a credit fund, subject to adjustment on the basis of such bank's average

daily deposits as shown by the first complete annual statement required by Section 9011, at the time the second assessment required by the said section is due; provided that such 4% shall not be required of new banks formed by the re-organization or consolidation of banks that have previously complied with the terms of this act with reference to the payment of assessments.

"The Depostors' Guaranty Fund Commission is authorized and empowered to make an adjustment of the rates of assessment to be paid by any bank which hereafter engages in the banking business by requiring such bank to contribute to the Depositors' Guaranty Fund a just and equitable sum, so that the Credit Fund and the first two assessments will place it on an equal basis in such respect with other banks heretofore admitted."

Plaintiff bank was organized as a state bank in 1926, and, in compliance with the provisions of chapter 123, Laws 1919, was required, before securing from the superintendent of banks a certificate of authority authorizing it to open for business as a state bank, to segregate and credit to the account of the depositors' guaranty fund commission the sum of $4,000 of its money, being four per cent of plaintiff's authorized capital stock of $100,000. This was done on February 2, 1926. In 1927, plaintiff bank paid into the depositors' guaranty fund the sum of $472.40, which sum represented one-fourth of one per cent of plaintiff's average daily deposits for the preceding year.

By the provisions of chapter 54, Laws 1927, effective July 1, 1927, the pre-existing scheme of bank guaranty was entirely abandoned, and since that date no assessments have been made or attempted to be made for the benefit of the old guaranty fund to the credit of which plaintiff placed its initial payment of $4,000 and its 1927 assessment of $472.40. (For the change in the law accomplished by chapter 54, Laws 1927, see State ex rel. v. Smith, supra.) In 1928, the depositors' guaranty fund commission attempted to make an adjustment as of date December 31, 1927, of plaintiff's initial credit of $4,000 to the depositor's guaranty fund, and its 1927 assessment paid thereto, purporting to act in compliance with the contemplation particularly of chapter 123, Laws 1919, above set forth. On December 31, 1927, the aggregate amount credited to the depositors' guaranty fund in open state banks in the state of South Dakota was $596,480.56. The total average

daily deposits of all open state banks for the state of South Dakota for the year 1927 was $65,818,800. The commission divided the aggregate undrawn balances on deposit in open state banks to the credit of the guaranty fund amounting to $596,480.56 by the total average daily deposits of open state banks for 1927, $65,818,800, the quotient being .009062, which quotient was used to determine the adjustment to be made with plaintiff bank concerning its initial contribution and first assessment. The average daily deposits of plaintiff bank for the year 1927 amounted to $447,333. The guaranty fund commission multiplied said average daily deposit by the quotient of .009062, derived as above, the result being $4,053.73, which amount the guaranty fund commission determined as the just and equitable sum to be contributed by plaintiff bank to the guaranty fund. Plaintiff bank had, in fact, contributed by crediting its initial contribution and first assessment as above set forth, $4,472.40. The guaranty fund commission therefore ordered the plaintiff bank to retain as a credit to the guaranty fund the sum of $4,053.73, arrived at as above explained, and authorized the plaintiff to withdraw for its own uses and purposes from the credit standing on its books to the guaranty fund the sum of $418.67. Plaintiff refused to accept said adjustment, and maintains the position that it is entitled to withdraw from the sum of $4,472.40 previously credited on its books to the guaranty fund, not the sum of $418.67, the withdrawal of which was offered by the guaranty fund commission, but the sum of $4,000, being the entire amount of the initial credit of four per cent of plaintiff's authorized capital stock made by plaintiff on its books to the guaranty fund when plaintiff commenced business. Plaintiff instituted this action in the court below pleading all the facts fully by its amended complaint, and asking that the defendant members of the guaranty fund commission be required to cancel said credit of $4,000, and that plaintiff be permitted to retain said sum of $4,000 free and clear of any claim of the depositors' guaranty fund. .

To this amended complaint, defendants demurred upon the ground that the same did not state facts sufficient to constitute a cause of action or to entitle the plaintiff to the relief demanded, and the matter being regularly brought on for hearing, an order was duly made and entered sustaining the demurrer, from which order plaintiff has now appealed.

Appellant pleads, and the demurrer admits, that at all times from and after February 2, 1926, when appellant commenced business and entered its initial credit to the guaranty fund, the guaranty fund was hopelessly insolvent, and there was neither prospect nor possibility that any part of the same would ever be available for depositors of appellant, or any other open contributing bank. As a matter of fact, in February, 1926, there was available in the guaranty fund less than half a million dollars, and there were outstanding interest-bearing certificates against and payable from the fund issued to depositors of approximately 160 previously failed state banks in the aggregate of appreciably more than twenty million dollars. By December 31, 1927, the date as of which the adjustment of which appellant complains was undertaken, there was available to the credit of the guaranty fund in open state banks as recited in the complaint approximately half a million dollars and outstanding against it, held by depositors of 230 previously failed banks, interest-bearing certificates amounting to something more than forty million dollars, and further contributions to the fund had been cut off by the enactment of chapter 54, Laws 1927, effective July 1, 1927, so that the assessment of February, 1927, was the last made, and the last that could be made for the benefit of the guaranty fund.

Appellant maintains, in substance, that the half million dollar credit to the guaranty fund on December 31, 1927, was in actual fact a fictitious credit vastly more than offset by the more than forty million dollars in certificates against it outstanding; that such half million dollar credit had a mere book existence solely by reason of the fact that the guaranty fund commission did not know how safely to pay and distribute it to the variously contending claimants against it, some or all of whom were admittedly entitled to it, but who were asserting conflicting claims as to priority of payment from it. Appellant maintains that under the law it was the legislative intent that a new bank admitted to the guaranty fund should make a just and equitable contribution rateably with other previously existing state banks, not to a fictitious book credit which could not by possibility benefit any open bank or its depositors, but to an actual existing guaranty fund available for the benefit of depositors of any or all open banks should they subsequently fail and be unable to meet deposit claims; and appellant

submits that to require it to contribute the initial credit of $4,000 to the benefit of a fund which really belonged already to prior claimants against it, and which could never by any possibility be available in whole or in part for the benefit of the depositors of appellant or any other open banks (in the event they should subsequently fail), unconstitutionally deprived appellant of its property without due process of law (section 2, Art. 6, Const. S. D.), and amounted to an unconstitutional taking of appellant's property without just compensation (section 13, Art. 6, Const. S. D.).

As we understand the situation, appellant does not question the fairness of the method adopted by respondents in determining the amount appellant should contribute to the guaranty fund in order to be entitled to the benefits thereof ratably with other open contributing banks, and if the half million dollars in the guaranty fund had been, in fact, in the guaranty fund with no outstanding claims against it, and available for the depositors of appellant and other open banks in the event of failure, appellant would be making no complaint and would concede that it had been required to contribute "a just and equitable sum" so that, by virtue of its initial credit and first assessments, it had been placed "on an equal basis in such respect with other banks heretofore admitted."

Appellant argues that the duty of contributing ratably to money in the guaranty fund which the Legislature imposed upon new banks beginning business when there was a balance in the guaranty fund was based entirely upon the assumption that any moneys in the guaranty fund would be actually available moneys for the benefit of contributing banks; that the Legislature never anticipated that there might be a book credit to the guaranty fund with valid outstanding claims against it so proportionately great that it would never be humanly possible for the fund to regain solvency. It is undoubtedly true that the guaranty fund legislation, prior to 1927, was not enacted with the possibility of any such happening in mind. It is doubtless true that, if the Legislature had foreseen such a contingency, the form of legislation would have been different in some respects and particulars from what it was; perhaps there would have been no bank guaranty legislation. The mere fact, however, that events probably not foreseen by the Legislature had transpired does not permit the court to undertake to repeal existing law or enact new law.

It would seem that every argument advanced by appellant to support its claim of right to refund of its initial $4,000 credit to the guaranty fund would, with equal force, support a claim to refund of its 1927 assessment. Yet appellant does not seek the return of its 1927 assessment, and concedes that no such relief could be awarded, but bases its claim to a return of the initial credit on the provisions of chapter 123, Laws 1919, in the light of the history and purpose of the legislation, and maintains, in substance, that fact conditions arising subsequently to the enactment of the legislation and never contemplated or anticipated when the legislation was enacted have created such a state of affairs that the only possible "just and equitable sum" which respondents could require appellant to contribute in making the adjustment under chapter 123, Laws 1919, in order to admit appellant to the fund on an equal basis with respect to other open banks, would be nothing at all, and therefore appellant submits that respondents have the power and ought, under the provisions of chapter 123, Laws 1919, to refund to appellant its entire initial credit, notwithstanding the fact that respondents have no authority or power to refund the 1927 assessment, and had no power to refrain from levying the same.

Respondents maintain that chapter 123, Laws 1919, did not in any event give them any power of adjustment with reference to the required initial credit of four per cent of the authorized capital stock, but authorized them to make adjustment only with reference to the first two assessments to be levied against a new bank coming into the system, to the end that the sum total of such fixed initial contribution, plus the first two assessments, might amount to "a just and equitable sum" entitling the new bank to the benefit of the fund on a fair basis ratably with other contributing banks. This precise point, we think, we need not attempt to decide in this case.

The entire scheme of bank guaranty and the creation of all rights and obligations under the Bank Guaranty Law found their sanction in the police power of the sovereign state. State ex rel. v. Smith, 58 S. D. 22, 234 N. W. 764, supra; Abie State Bank v. Bryan, 282 U. S. 765, 51 S. Ct. 252, 75 L. Ed. 690. The underlying theory of the law was the creation of a fund by contributions required from state banks to be used in case of necessity for pay-

ment of depositors of any contributing bank which failed. The law never contemplated (that is, the original scheme as distinguished from that erected by chapter 54, Laws 1927) that money contributed by any member bank should be used solely for the benefit of its own depositors if it should fail. In fact, the very contrary was anticipated. It was believed and was essential for the successful operation of the scheme that relatively small contributions from a large number of banks, most of which would be likely to continue in successful operation indefinitely, would create a fund ample to take care of the depositors in a proportionately small number of the contributing banks which it was anticipated might fail. The more nearly a situation was approached where the contribution of each contributing bank to the guaranty fund might be used (at least in part) for the benefit of its own depositors, the closer drew the breakdown of the entire scheme. An incoming bank was not relieved of the duty to contribute because of the possibility that an existing guaranty fund might not benefit its depositors, nor did it become entitled to refund when a situation arose where the fund to which it had contributed was utterly exhausted by other uses, and could never benefit its depositors. Suppose there was a guaranty fund of half a million dollars when appellant came into the system with no outstanding claims whatever against it, and suppose that the day after appellant's contribution thereto had been adjusted and determined a bank in the system other than appellant failed and the entire amount in the fund was required and used to meet the claims of its depositors; certainly that occurrence would not entitle appellant to any refund, nor does appellant so maintain. Appellant argues that there is a considerable distinction between being required to contribute to a fund from which its depositors may by possibility (though not necessarily) benefit, and being required to contribute to a fund from which its depositors can never by any possibility benefit, and that the Legislature contemplated, and constitutionally might require a contribution of appellant in the first case, but never intended and could not constitutionally require a contribution by appellant in the second case. This court has held, and we think properly, that the happening of an utterly unanticipated and unforeseen (and perhaps unforseeable) contingency by virtue of which the guaranty fund became, in substance, insolvent, and could never by any possibility be available

for the benefit of depositors of banks still open upon which assessments for the fund were being levied, could not excuse the continuance of such assessments (so long as the law remained unchanged), and did not render the law unconstitutional. First State Bank of Claremont v. Smith (1926), 49 S. D. 518, 207 N. W. 467.

■ Appellant was under no obligation in 1926 to engage in the business of banking under the laws of this state. The then existing law upon its face required appellant, as a condition precedent to engaging in such business, to make an initial contribution to the guaranty fund, and to pay assessments for the benefit of the fund thereafter. That law did not take cognizance of the fact that there might be valid outstanding claims against the guaranty fund vastly greater than the amount of the fund, and in its provisions, with reference to requiring an initial contribution from new banks, took no consideration of, and made no special provision or allowance for, such contingeny. Appellant knew, or is chargeable with knowing, the amount standing to the credit of the guaranty fund at that time, and the amount of outstanding certificates payable therefrom. Appellant knew, or is chargeable with knowing at that time as well as it now knows, that money which it was required under the terms of the law to pay to the guaranty fund would never be available under existing circumstances for the benefit of appellant's own depositors if appellant should fail. Appellant knew, or is chargeable with knowing then as well as it knows now, that the guaranty fund was hopelessly insolvent beyond any human possibility of repairment. Appellant having voluntarily elected, knowing or chargeable with knowing all the facts, to become a joint adventurer, pursuant to the terms of existing law, in an enterprise already palpably wrecked beyond repair, cannot now be heard to urge facts which it then knew as grounds for the return of the price which the law required to be paid (and which appellant voluntarily did pay) for what it then apparently deemed a privilege worth the money.

The order appealed from must be affirmed.

ROBERTS, J., not sitting.

POLLEY, P. J., and WARREN and RUDOLPH, JJ., concur.