[Sac. No. 5758. In Bank. June 15, 1948.]

EMIL PALERMO, Respondent, v. STOCKTON THEATRES, INC., Appellant.

Freed & Freed, Eli Freed, Emmett F. Gebauer, William F. Cleary and Guy C. Calden for Appellant.

Honey & Mayall, Forrest E. Macomber, A. B. Bianchi and Garrett H. Elmore for Respondent.

SCHAUER, J.—In a suit for declaratory relief plaintiff seeks to have adjudged violative of the California Alien Land Act (Stats. 1921, p. lxxxiii, as amended; 1 Deering's Gen. Laws, Act 261), and consequently void and of no effect, a lease of commercial real property in California executed by plaintiff's predecessor in interest, as lessor, to defendant corporation, as lessee. The defendant lessee corporation also is the successor in interest of the lessees' rights, if any there be, under a previously executed lease of the same property to certain Japanese nationals. The capital stock of defendant lessee is and at all times concerned has been "principally and almost wholly" owned by nationals of Japan; i. e., by aliens not eligible to citizenship in this country.

Under the provisions of the Alien Land Act (§ 3), as amended in 1923 (Stats. 1923, p. 1021), the right to lease, or otherwise use or enjoy, real property in this state is granted to such a corporation "to the extent and for the purposes prescribed by any treaty now existing between the . . . United States" and Japan. The trial court rendered judgment in plaintiff-lessor's favor, declaring that the lease "is, and at all times was, void," and defendant-lessee appealed. Following decision of the District Court of Appeal, Third Appellate District, reversing the judgment, this court granted a hearing for the purpose of giving further study to the problems presented and to consider in particular the question of a possible infringement by the state statute upon the treaty powers of the federal government. After such study we have concluded that the opinion of the District Court of Appeal, prepared

by Mr. Justice Peek, correctly treats and disposes of all issues essentially involved, and it is therefore, with further discussion concerning the asserted conflict between state statute and federal treaty power, and comment as to a suggested constitutional pronouncement, adopted as the opinion of this court. Such opinion (with appropriate deletions and additions of introductory, conjunctive, and other *pro forma* matter as indicated) is as follows:

"[　] The record [　] discloses [　] the following [undisputed] facts:

"On January 3, 1930, respondent's [plaintiff lessor's] predecessor leased to appellant's [defendant lessee's] predecessors, who were nationals of Japan, certain premises situated in the city of Stockton, California, for theater purposes for a term of 10 years, commencing January 1, 1931, under the provisions of the Alien Land Act of this state (Stats. 1921, p. lxxxiii, as amended; 1 Deering's Gen. Laws, Act 261), and in accordance with the provisions of the commercial treaty which had been concluded between the United States and Japan on April 5, 1911 (37 Stats. at L. 1504). On December 22, 1934, respondent's predecessor gave the lessees an option for a term of 10 years longer than the term of the original lease. Said option recited that it was given for a valuable consideration, and that it was attached to and became a part of the condition of said lease. On January 16, 1935, the lessees, with the consent of the lessor, transferred all their right, title and interest in said lease and option to the appellant, a corporation, the capital stock of which was almost wholly owned by nationals of Japan. On January 26, 1940, the treaty between the United States and Japan was abrogated. On February 14, 1940, appellant served respondent's predecessor with a written notice of its election to exercise said option for an additional term of 10 years, commencing January 1, 1941, and on September 13, 1940, pursuant to said option the parties entered into a written agreement of lease for the additional term of 10 years. On October 27, 1941, respondent's predecessor died, and respondent became the legal owner of the premises in question.

"The record further discloses that on October 19, 1944, respondent, who had been employed by appellant in the operation of the theater from 1936 to the time the present action was filed, served on appellant a demand that the latter vacate the premises forthwith, on the ground that the occupancy thereof by appellant was illegal under the provisions of the

Alien Land Act of California. On November 20, 1944, the present action was brought by respondent to have the rights of the parties adjudicated.

"The trial court found generally in favor of respondent, and particularly that the lease of September 13, 1940, was 'partially a new Lease and partially an extension of the pre-existing Lease,' that no notice of appellant's election to exercise the option was served on respondent's predecessor until February 14, 1940, which was subsequent to the termination of the treaty between the United States and Japan, and that, while there was no proof of a conspiracy to violate the law, the said lease was void and of no force or effect whatsoever. In a written memorandum of decision the trial court predicated its holding on the ground that the treaty removed the lease from the operation of the California statute and that in the absence of a treaty, a Japanese alien cannot enter into a lease of commercial property in the State of California.

"While other issues were raised in the proceedings in the trial court and are argued in the briefs on appeal, the basic question on which the correctness of the judgment herein turns is the effect of the abrogation of the treaty between the United States and Japan on the permissive provisions of the Alien Land Act with respect to the right of a corporation in which a majority of the issued capital stock is owned by non-eligible aliens of Japanese nationality to acquire or enjoy an interest in real property in this state which could have been acquired or enjoyed under the terms of said treaty.

"The pertinent provisions of the act in question, sections 1, 2 and 3 of the Alien Land Law (1 Deering's Gen. Laws, Act 261), as adopted by the electorate of this state in 1920, and thereafter [pursuant to permission contained in § 13 of the initiative act] amended by the act of the Legislature approved June 20, 1923 (Stats. 1923, p. 1021), and as they read at the time herein involved, provided as follows:

" '1. All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, use, cultivate, occupy, transfer, transmit and inherit real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state.

" '2. All aliens other than those mentioned in section one of this act may acquire, possess, enjoy, use, cultivate, occupy

and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise.

" '3. Any company, association or corporation organized under the laws of this or any other state or union, of which a majority of the members are aliens other than those specified in section one of this act, or in which a majority of the issued capital stock is owned by such aliens, may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such members or stockholders are citizens or subjects, and not otherwise. Hereafter all aliens other than those specified in section one hereof may become members of or acquire shares of stock in any company, association or corporation that is or may be authorized to acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, in the manner and to the extent and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise.'

"Likewise the pertinent provisions of article I of the Treaty of April 5, 1911, between the United States and Japan provided in part:

" 'The citizens or subjects of each of the High Contracting Parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established.'

 "It is a well established principle of statutory law that, where a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time

of the reference and not as subsequently modified, and that the repeal of the provisions referred to does not affect the adopting statute, in the absence of a clearly expressed intention to the contrary. (*Rancho Santa Anita* v. *City of Arcadia* [1942], 20 Cal.2d 319, 322 [125 P.2d 475] ; *Brock* v. *Superior Court* [1937], 9 Cal.2d 291, 297-298 [71 P.2d 209, 114 A.L.R. 127] ; *In re Burke* [1923], 190 Cal. 326, 327-328 [212 P. 193] ; *Don* v. *Pfister* [1916], 172 Cal. 25, 28, 31 [155 P. 60] ; *Ramish* v. *Hartwell* [1899], 126 Cal. 443, 447 [58 P. 920] ; *Ventura County* v. *Clay* [1896], 112 Cal. 65, 72 [44 P. 488] ; *People* v. *Clunie* [1886], 70 Cal. 504, 506 [11 P. 775] ; *People* v. *Whipple* [1874], 47 Cal. 592, 593-594; *Spring Valley Water Works* v. *San Francisco* [1863], 22 Cal. 434, 439; 59 C.J. § 548, p. 937.)

██ "This principle applies to the adoption of a statute of another jurisdiction (*Brock* v. *Superior Court, supra,* at page 297; *In re Burke, supra,* at page 328) ; and inasmuch as treaties have the force and effect of federal statutes (52 Am. Jur. §§ 4, 17, pp. 807, 815), it [ ] [seems reasonable to hold] that it applies to a treaty to the same extent that it would to an act of Congress.

██ "It also [ ] [must] be noted that there is a cognate rule, recognized as applicable to many cases, to the effect that where the reference is general instead of specific, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time, and (it may be assumed although no such case has come to our attention) as they may be subjected to elimination altogether by repeal. (*Kirk* v. *Rhoads* [1893], 46 Cal. 398, 403; *Bolton* v. *Terra Bella Irr. Dist.* [1930], 106 Cal.App. 313, 322 [289 P. 678] ; *Thoits* v. *Byxbee* [1917], 34 Cal.App. 226, 231 [167 P. 166] ; 50 Am.Jur. 58-59; 59 C.J., § 624, pp. 1060-1061. And see *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.* [1918], 177 Cal. 249, 254 [170 P. 426].)

██ ██ "The question whether the reference to the treaty contained in the California Land Act should be deemed specific or general within the meaning of the foregoing rules might, as an abstract proposition, admit of different opinions. The language is 'any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject.' However, in view of the

fact that there is grave doubt whether our Legislature could constitutionally delegate to the treaty-making authority of the United States the right and power thus directly to control our local legislation with respect to future acts (*Rancho Santa Anita* v. *City of Arcadia, supra,* at page 319, 322; *Brock* v. *Superior Court, supra,* at page 297; *In re Burke, supra,* at pages 328-329), we are constrained to hold that the reference is specific and not general, since such a construction is at least a reasonable one (See [*In*] *re Heath* [1891], 144 U.S. 92, 93-95 [12 S.Ct. 615, 36 L.Ed. 358]) and therefore to be preferred to one of doubtful validity (11 Am.Jur. § 97, pp. 729-730; *Matthews* v. *Matthews* [1925], 240 N.Y. 28 [147 N.E. 237, 239, 38 A.L.R. 1079]).

"According to the text of the former of these two last cited authorities, 'The duty of the courts so to construe a statute as to save its constitutionality when it is reasonably susceptible of two constructions includes the duty of adopting a construction that will not subject it to a succession of doubts as to its constitutionality, for it is well settled that a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubt upon that score.'

"In the case last cited, the New York Court of Appeals said: 'A like duty requires us to avoid a construction which raises grave and doubtful constitutional questions if the statute can reasonably be construed so as to avoid such questions.'

"The conclusion which this construction leads to, viz., that the Alien Land Act incorporated the then-existing provisions of the treaty and retained them after the treaty was abrogated, suggests a somewhat similar situation which apparently existed in some of the states when the Volstead Act [41 U.S. Stats. at .L., p. 305], the provisions of which many local prohibition laws either adopted or copied, was repealed. (See, Annotation, 88 A.L.R. 1365-1369.) It seems that the general view was that the repeal did not automatically effect a termination of the local law. In our own state the question was not presented, for the Wright Act [Stats. 1921, p. 79] was repealed [Stats. 1933, p. lxxxviii] prior to the repeal of the federal act; yet the decisions of our courts leave little doubt that had this not been done the state law would have remained unaffected by the repeal of the national law. (*People* v. *Pagni* [1924], 69 Cal.App. 94, 98-99 [230 P. 1001];

*People* v. *Wood* [1928], 88 Cal.App. 621, 625 [264 P. 298] ; *In re Volpi* [1921], 53 Cal.App. 229 [199 P. 1090]. And see *In re Burke, supra,* at pages 328-329.)

''Another interesting example of a reference statute is the so-called Assimilative Crimes Act which embodies section 468 of [title 18] United States Code, and which, as enacted in 1898 (30 Stats. 717), provided in effect that a crime committed in a place over which the United States had exclusive jurisdiction was punishable in the same way and to the same extent as it was punishable under the law of the state, territory or district within the territorial limits of which it was committed, and that 'every such State, Territorial, or District law shall, for the purposes of this section, continue in force, notwithstanding any subsequent repeal or amendment thereof by any such State, Territory, or District.'

''In construing said section of the act, the United States Supreme Court has held that the reference therein was to the law of the state, territory, or district only as such law existed at the time of the passage of the act *(United States* v. *Press Publishing Co.* [1910], 219 U.S. 1, 9-10 [31 S.Ct. 212, 55 L.Ed. 65]), that said section was designed and served to enforce federal law and not the law of a state, territory, or district *(Puerto Rico* v. *Shell Co.* [1937], 302 U.S. 253, 266 [58 S.Ct. 167, 82 L.Ed. 235]), and that, inasmuch as the federal law would not be responsive to changes in the law of the state, territory, or district, whether they should occur by way of repeal or amendment, said section could not properly be deemed to constitute an unlawful attempt to delegate to local lawmakers the power to work a change in the federal law *(Franklin* v. *United States* [1909], 216 U.S. 559, 568-569 [30 S.Ct. 434, 54 L.Ed. 615]).

Likewise, it may be said that the California Alien Land Act refers to treaties with the nations concerned only as such treaties existed at the time of the passage of the act (or of the amendments containing the same reference), that said act declares the law of the state and not the provisions of the treaty agreements between the United States and said nations, and that, being unaffected [insofar as it may remain valid as a law of the state] by the abrogation or amendment of a treaty, said act does not unconstitutionally delegate to the treaty-making authority of the United States the power to terminate or change the law of our state.

''It should be noted that the section mentioned was sub-

stantially amended in 1943 [Stats. 1943, chs. 1003, 1059]. However, it was not such an amendment as would affect our discussion of the question here presented.

"Of course if there were an express provision in the Alien Land Act which unmistakably made the duration of the local provisions coterminous with those of the treaty, such a provision would have to be given effect according to its tenor and validity. An example of that kind of a provision is found in section 71 of title 8 of the United States Code [24 Stats. 476], dealing with the subject of alien ownership of land. The language of that section is:

" 'The prohibition of this section shall not apply to cases in which the right to hold or dispose of lands in the United States is secured by existing treaties to citizens or subjects of foreign countries, which rights, so far as they may exist by force of any such treaty, shall continue to exist so long as such treaties are in force, and no longer.'

"The fact that similar language was not used by our Legislature may be thought to constitute some evidence of the fact that such a result was not intended.

 "Neither is this a case of temporary or emergency legislation the operative effect of which, by reason of changed conditions, must be deemed to have terminated of its own limitations or which should be declared obsolete because to enforce it would be inequitable. (See for example *Nashville etc. R. Co.* v. *Walters* [1934], 294 U.S. 405, 415 [55 S.Ct. 486, 79 L.Ed. 949]; *C. K. Chastleton Corp.* v. *Sinclair* [1923], 264 U.S. 543, 547-548 [44 S.Ct. 405, 68 L.Ed. 841].) The treaty of April 5, 1911, was not of a temporary character, particularly at the time it was readopted in sections 2 and 3 of the Alien Land Act by the amendment of 1923. The duration provisions of the treaty were contained in article XVII, which read as follows:

" 'The present Treaty shall enter into operation on the 17th of July, 1911, and shall remain in force twelve years or until the expiration of six months from the date on which either of the Contracting Parties shall have given notice to the other of its intention to terminate the Treaty.

" 'In case neither of the Contracting Parties shall have given notice to the other six months before the expiration of the said period of twelve years of its intention to terminate the Treaty, it shall continue operative until the expiration of six months from the date on which either Party shall have given such notice.'

"It is apparent that the treaty considered as municipal law must be deemed to have been permanent or perpetual. (25 R.C.L. §§ 10 and 11, p. 765. See, also, 50 Am.Jur. §§ 513-515, pp. 524, 525.)

"Nor is there anything in the situation here which would deprive the respondent of any constitutional right if the law as it originally read were deemed to have been continued in effect subsequent to January 26, 1940 [the date of the treaty abrogation]. And in the absence of a constitutional objection it is generally held that the courts have no right to declare a statute obsolete by reason of a supervening change in the conditions under which it was enacted. (*Benson* v. *Hunter* [1921], 23 Ariz. 132 [202 P. 233, 234]; *McKeown* v. *State* [1939], 197 Ark. 454 [124 S.W.2d 19, 22-23]; *Corn Exchange Sav. Bk.* v. *Smith* [1931], 59 S.D. 182 [239 N.W. 186, 189, 78 A.L.R. 800]; *Gulf Refining Co.* v. *City of Dallas* (Tex. Civ.App. [1928]), 10 S.W.2d 151, 159. See, also, *Painless Parker* v. *Board of Dental Exam.* [1932], 216 Cal. 285, 299 [14 P.2d 67].)

"Finally, the fact that, when amending the Alien Land Act in 1943 and again in 1945, the Legislature was silent on the question of the effect of the abrogation of the treaty on corresponding provisions of the statute, seems to indicate in the opinion of that body that no change was effected. This is particularly true in view of the fact that this act is a definite exercise of the police power expressed by the people and the Legislature of this state [ ] [*Mott* v. *Cline* (1927), 200 Cal. 434, 446-447 [253 P. 718]]. However reluctantly such power may have been exercised in favor of noneligible aliens, once it was exercised its intended scope and effect within the defined limits were given liberal interpretation by our courts. (See *State of California* v. *Tagami* [(1925), 195 Cal. 522 (234 P. 102)] at pages 529-532.) This accords also with the [ ] view expressed in the decisions that particularly in respect of matters within the police power the action of the state is ordinarily independent of that of the federal government. (*People* v. *Pagni, supra,* at page 99 [of 69 Cal.App.]; *People* v. *Wood, supra,* at page 625 [of 88 Cal.App.].)

"Since we have concluded that the abrogation of the treaty had no effect on the provisions of the Alien Land Act, it is obvious that the lease of September 13, 1940, was valid irrespective of such abrogation. It is unnecessary, therefore, to

consider what effect on vested or contingent rights the repeal or annulment of those provisions would have had, nor the extent to which a private individual as distinguished from the state would have had the right to take advantage of such repeal or annulment, or questions concerning estoppel on the part of this respondent to attack the validity of the lease.

''We may notice, however, one other reason assigned by respondent for holding the lease invalid, viz., the fact that said lease contains an option provision permitting the lessee to purchase the property demised. [ ] [Even if we assume that] this provision is void insofar as it purports to confer any such right on a noneligible alien, it is clearly a severable part of the lease and its validity could not affect the remaining and valid portions thereof. (*Mott* v. *Cline* [*supra*], 200 Cal. 434, 450 [253 P. 718] ; [see, also, *Spaulding* v. *Yovino-Young* (1947), 30 Cal.2d 138, 141 (180 P.2d 691)].)''

Plaintiff-lessor has particularly urged before this court that to construe the statute's reference to the treaty as being specific rather than general renders the act unconstitutional because with such a construction the act infringes upon and embarrasses the treaty-making power of the United States government, for the reason that Japan would not enter into a new treaty which gives it ''lesser rights than those now given by the frozen state laws.'' Subsequent to our granting a hearing in this case, the Supreme Court of the United States, in *Clark* v. *Allen* (1947), 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 1638, 170 A.L.R. 953], rejected a similar contention with reference to section 259 of the California Probate Code. It was there held that although under the provisions of the state law the right of a nonresident alien to take property in California by will or succession depends upon a reciprocal right of United States residents and citizens to take property in such alien's country, and although the existence of such a reciprocal right depends in part at least upon treaties between the government of the United States and that of the particular foreign country involved, the California statute is ''not unconstitutional as an extension of state power into a field of foreign affairs exclusively reserved to the federal government, and that California had not entered into the forbidden domain of negotiating with a foreign country or of making a compact with it contrary to article I, section 10, of the federal Constitution.'' (*Estate of Knutzen* (1948), 31 Cal.2d 573, 577 [191 P.2d 747];

see also *Estate of Bevilacqua* (1948), 31 Cal.2d 580, 582 [191 P.2d 752].) We hold the same to be true of the California Alien Land Act as construed hereinabove; hence we need not consider other asserted weaknesses in plaintiff's argument on this phase of the case.

It has been suggested that this case could be used as a vehicle for reexamining the earlier rulings of the United States Supreme Court and of this court holding constitutional the basic provisions of the Alien Land Act (see e.g., *Webb* v. *O'Brien* (1923), 263 U.S. 313, 322 [44 S.Ct. 112, 68 L.Ed. 318, 321]; *Porterfield* v. *Webb* (1923), 263 U.S. 225, 233 [44 S.Ct. 21, 68 L.Ed. 278, 281]; *Mott* v. *Cline* (1927), 200 Cal. 434, 445 [253 P. 718]; *In re Y. Akado* (1922), 188 Cal. 739, 743 [207 P. 245]; *Frick* v. *Webb* (1923), 263 U.S. 326, 333 [44 S.Ct. 115, 68 L.Ed. 323, 325-326]; *Cockrill* v. *California* (1924), 268 U.S. 258 [45 S.Ct. 490, 69 L.Ed. 944, 946-947]; see also *People* v. *Oyama* (1946), 29 Cal.2d 164 [173 P.2d 794] and cases there cited; *Oyama* v. *California* (1948), 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. ——]; *Terrace* v. *Thompson* (1923), 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255, 272]; *United States* v. *Fox* (1876), 94 U.S. 315 [24 L.Ed. 192]), that we should reverse our previous holdings and dispose of this case by ruling that "the statute here involved is clearly unconstitutional, and should, therefore, be stricken down." We are of the view that this issue, unnecessary to the decision, should not be decided here or made the subject of a dictum. It has heretofore been considered against the policy of this court (and of courts of last resort generally) to reach out and unnecessarily pronounce upon the constitutionality of any duly enacted statute. At least as early as *Estate of Johnson* (1903), 139 Cal. 532, 534 [73 P. 424, 96 Am. St.Rep. 161], this court said, "A court will not decide a constitutional question unless such construction is absolutely necessary" (see, also, *Marin Municipal Water Dist.* v. *Dolge* (1916), 172 Cal. 724, 726 [158 P. 187]) and as recently as *Hurd* v. *Hodge* (May 3, 1948), 334 U.S. 24 [68 S.Ct. 847, 92 L.Ed. ——], the United States Supreme Court in determining one of the racial restriction cases said: "Upon full consideration, however, we have found it unnecessary to resolve the constitutional issue which petitioners advance; for we have concluded that judicial enforcement of restrictive covenants by the courts of the District of Columbia is improper for other

reasons hereinafter stated.⁶'' The footnote referred to reads: ''It is a well-established principle that this Court will not decide constitutional questions where other grounds are available and dispositive of the issues of the case. Recent expressions of that policy are to be found in *Alma Motor Co.* v. *Timken-Detroit Axle Co.* [1946], 329 U.S. 129 [67 L.Ed. 231, 91 L.Ed. 128] ; *Rescue Army* v. *Municipal Court* [1947], 331 U.S. 549 [67 S.Ct. 1409, 91 L.Ed. 1666].''

This case fits squarely into the policy above stated; we deem it improper to now strike that policy down. It seems to us that good judicial practice, as well as legal precedent, requires that we dispose of the case on the now thoroughly established grounds which are set forth hereinabove rather than to gratuitously make opportunity for either reaching or declaring views on the suggested constitutional question.

For the reasons above stated, the judgment is reversed.

Shenk, J., Edmonds, J., and Spence, J., concurred.

GIBSON, C. J.—I concur in the judgment of reversal and am in accord with the conclusion reached in the majority opinion that the Alien Land Act incorporated the provisions of the treaty between the United States and Japan as it existed on April 5, 1911, and that the abrogation of the treaty in 1940 had no effect on the operation of the act, which, therefore, still permits a lease of real property by a corporation such as the one involved here. I also agree that as a general rule we should not decide constitutional questions if the case can be disposed of on other grounds, but under the circumstances presented here and because of the position which I took in *Takahashi* v. *Fish & Game Commission,* 30 Cal.2d 719, 737 [185 P.2d 805], I deem it proper to state that I am in full agreement with the additional ground for reversal set forth in the concurring opinion of Mr. Justice Carter and Mr. Justice Traynor.

CARTER, J., and TRAYNOR, J.—We concur in the judgment.

As we view the present case it presents substantially the same issues of constitutionality as were involved in *Takahashi* v. *Fish & Game Commission,* 30 Cal.2d 719 [185 P.2d 805], reversed 333 U.S. 853 [68 S.Ct. 731, 92 L.Ed ——]. In our opinion the unconstitutionality of the provisions of the California Alien Land Act involved in this case is clearly

demonstrated by the dissenting opinion of Mr. Justice Carter in that case. If these constitutional questions had not previously been considered by this court it might be possible to construe these provisions in such a way as to avoid constitutional implications. In view of previous decisions of this court, however, such constitutional implications cannot be avoided. We wish to make it clear, therefore, that we still adhere to the views expressed in the dissenting opinion in the Takahashi case.

There can be no doubt that a state cannot deny "to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood." (*Traux* v. *Raich*, 239 U.S. 33, 39 [36 S.Ct. 7, 60 L.Ed. 131, Ann.Cas. 1917B 283, L.R.A. 1916D 545].) Thus persons may not be barred because of their race or nationality from employment in the ordinary industry or business of another. It is common knowledge that it is necessary to the conduct of an ordinary industry or business enterprise to own or lease the property in which the industry or business is conducted. If the state could prohibit aliens ineligible to citizenship from owning or leasing real property it would thereby effectively prevent such persons from conducting ordinary industrial or business enterprises. Such a discrimination, if valid, would confine the alien's right to engage in an ordinary means of earning a livelihood to serving as an employee or servant of a citizen or of a foreign national permitted to own or lease real property or of corporations owned by a majority of such citizens or nationals. The effect of such legislation is to impose upon the alien ineligible to citizenship an economic status inferior to all others earning a living in the state. Such a discrimination cannot be sustained under the Fourteenth Amendment to the Constitution of the United States. Even in *Terrace* v. *Thompson*, 263 U.S. 197, 221 [44 S.Ct. 15, 68 L.Ed. 255], the United States Supreme Court recognized that a state could not discriminate against aliens ineligible to citizenship if that "discrimination was imposed upon the conduct of ordinary private enterprise covering the entire field of industry with the exception of enterprises that were relatively very small."

In our view the statute here involved is clearly unconstitutional, and should, therefore, be stricken down.

Respondent's petition for a rehearing was denied July 8, 1948.