[S. F. No. 15715.   In Bank.—July 26, 1937.]

A. A. BROCK, as Director of Agriculture, etc., et al., Applicants, v. SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

U. S. Webb, Attorney-General, Alberta Belford, Deputy Attorney-General, Walter L. Bowers, Deputy Attorney-General, and Ivan G. McDaniel for Applicants.

Everett W. Mattoon, County Counsel, A. Curtis Smith, Deputy County Counsel, Edwin H. Haas and Harry J. McClean for Respondents.

LANGDON, J.—This is an application for a writ of prohibition to compel the respondent Superior Court to refrain

from further proceedings directed toward the enforcement of an injunction. The issue involved is the constitutionality of the California Agricultural Adjustment Act of 1935 (Stats. 1935, chaps. 307, 416, pp. 1032, 1468; Deering's Gen. Laws, 1935 Supp., Act 146, p. 480), and the validity of proceedings taken thereunder to regulate the marketing of oranges and grapefruit within the state.

Three statutes were enacted by our legislature in 1935 for the purpose of regulating agricultural production and marketing. The Agricultural Prorate Act (Stats. 1935, chap. 471, p. 1526; Deering's Gen. Laws, 1935 Supp., Act 143a, p. 373, regulates *production* of agricultural products within the state of California. The Agricultural Marketing Agreement Act (Stats. 1935, chap. 677, p. 1856; Deering's Gen. Laws, 1935 Supp., Act 145, p. 471) regulates *marketing* or shipping of agricultural products within the state where there is *no corresponding federal regulation.* ▮ The Agricultural Adjustment Act, now before us, regulates *marketing* of agricultural products within the state *where there is federal regulation* of interstate shipment of the products, and the purpose of the act is to provide a regulation of *intrastate* commerce which will be correlated with the corresponding regulation of *interstate* commerce in the same commodities.

Section 1 of the Agricultural Adjustment Act declares that there exists a state and national emergency productive of widespread agricultural collapse, vitally affecting the public welfare; and that it is the policy of the state to cooperate with and assist the national government in promoting the rehabilitation of agriculture. Section 2 states the purposes of the act, among them being the restoration of farm prices to a level which will give a purchasing power equivalent to that during the period of 1909 to 1914, and the elimination of waste resulting from overproduction, disorderly marketing and unfair methods of competition. Section 6 permits persons or groups to enter into marketing agreements for any particular branch of the agricultural industry, or for any agricultural product or commodity; but no such agreement is subject to the provisions of the act until approved by the State Director of Agriculture. Section 6a provides that in order to carry out the purposes of the act, the State Director of Agriculture shall have power, after reasonable *notice and opportunity for hearing,* to enter into marketing agreements

with shippers and distributors, and to issue nondiscriminatory licenses to persons engaged in "producing, marketing, processing, packing, shipping, handling, or distributing, of any agricultural product or commodity or products thereof, or any competing product or commodity or products thereof". Such licenses are not to be issued unless there already exists "a corresponding Federal agreement or license regulating such business, trade or industry under the National Agricultural Adjustment Act". Likewise, no marketing agreement is to be approved unless it conforms with the terms of the federal marketing agreement.

Pursuant to the terms of the statute, the director gave notice of a hearing to be held in Los Angeles on October 9, 1935, upon a proposed license to regulate the shipment of oranges and grapefruit. From the evidence presented at the said hearing, the director determined that about 10 per cent of the oranges and about 35 per cent of the grapefruit grown in this state was marketed here; that the prices received by growers had, by reason of unrestricted marketing and resulting gluts and famines, greatly declined; that there exists a federal marketing agreement and order under the National Agricultural Adjustment Act, regulating the handling of oranges and grapefruit grown in California and Arizona and shipped in interstate commerce, designated Marketing Agreement No. 30, issued December 14, 1933, and Order No. 2, effective January 13, 1936; that the proposed license conformed to the standards fixed by the California act, and contained only such terms, provisions, methods and procedure as the corresponding federal order, except in so far as differences were made necessary to restrict the license to intrastate commerce; and that the administrative bodies or officers provided for under the license included only those who hold corresponding positions under the federal order, save where they have refused to serve. These findings are in conformity with the statutory requirements.

The license, issued January 7, 1936, and effective January 14, 1936, provides that it shall be administered by the Growers Advisory Committee and the Distribution Committee which are administering the federal order. Each week, after findings by the committees, the Director of Agricuture determines the total amount of oranges or grapefruit which shall be shipped in intrastate commerce. He then prorates to each

shipper the amount which he may ship, in proportion to the amount controlled by such shipper, and issues to each shipper an allotment showing such amount. Shipments in excess of allotments are punishable as misdemeanors, and are further subject to injunctions and civil action. To determine the prorate base, each shipper is required to file with the Growers Advisory Committee an estimate of the amount of fruit controlled by him as owner or under contract. The proportion of fruit controlled by the shipper to the total crop of that kind of fruit is then ascertained.

It is to be noted that the act which is before us, and the license issued thereunder, do not limit production, and do not establish prices or marketing practices or methods. Their sole object is to limit the total *shipments* of particular agricultural commodities.

On or about May 7, 1936, a group of shippers filed a complaint in the Superior Court of Los Angeles County, against the director and the members of the Advisory and Distribution Committees, applicants herein, to enjoin the enforcement of the act and the license, on the ground of unconstitutionality. An order to show cause was issued, and eventually, after hearing a temporary injunction was issued by the respondent Superior Court. On July 8, 1936, applicants moved to dissolve the injunction, and the motion was denied. Thereafter they sought a writ of prohibition from this court to restrain the respondent Superior Court from proceeding to enforce its injunction. An alternative writ was issued. Thereafter the parties entered into a stipulation eliminating issues of fact, and agreeing that the following were the sole issues: (1) the constitutionality of the statute; (2) the validity of existing federal regulations under the national Agricultural Adjustment Act of 1933 as amended; (3) the validity of the prescribed allotments with respect to the objection that they were frequently less than carload lots and made it impractical, costly and inefficient to market fruit or operate a packing plant, thus depriving the complaining shippers of the right to full enjoyment of their properties and businesses.

The chief basis of attack on the statute is that it provides for an unlawful delegation of legislative power, in violation of article IV, section 1, of the California Constitution. Three kinds of unconstitutional delegation are asserted by respondents: (1) to the Director of Agriculture; (2) to the federal

Congress and the Secretary of Agriculture, and (3) to a group of persons in an industry.

The first objection is that the Director of Agriculture, in his licensing activities, is given legislative power without any sufficient standard or control to govern his acts. A brief examination of the act is a sufficient answer to this objection. A number of purposes will be found clearly stated in section 2, namely, the prevention of unnecessary waste of agricultural wealth through disorderly marketing, the protection of the consumer while enabling producers to obtain a fair and reasonable return, and the raising of the price level to a specified point. It is provided that there shall be equal opportunities to growers and producers in the available markets, and that there must be a corresponding federal regulation with like terms, and an administrative agency with the same personnel as the federal agency. The director must find, after notice and hearing, that all the above conditions exist, before he may issue the licenses. The method of prorating is clearly set forth. There is not, therefore, any vesting of an uncontrolled discretion in the director, as is condemned by such cases as *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 [55 Sup. Ct. 241, 79 L. Ed. 446], and *Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 [55 Sup. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947]. The legislative standards are far more detailed and definite than those considered sufficient in *People* v. *Globe Grain & Milling Co.*, 211 Cal. 121 [294 Pac. 3] where the fish and game commission was given power to grant revocable permits to take fish for reduction purposes, provided that it appeared to the commission that the taking would not tend to deplete the species, or result in waste or deterioration of the fish. Many other cases may be found supporting the validity of standards not more definite than those provided in the present statute. The following decisions comprehensively review and discuss the leading cases: *Agricultural Prorate Com.* v. *Superior Court*, 5 Cal. (2d) 550, 568 [55 Pac. (2d) 495]; *Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 [48 Sup. Ct. 348, 72 L. Ed. 624]; *Tarpey* v. *McClure*, 190 Cal. 593 [213 Pac. 983]; *Metropolitan Water Dist.* v. *Whitsett*, 215 Cal. 400 [10 Pac. (2d) 751]; *People* v. *Globe Grain & Milling Co.*, supra; *United States* v. *Edwards*, 14 Fed. Supp. 384, 392. See, also, for an exhaustive study of the federal decisions, Cousens, Delegation of Legis-

lative Power, 33 Mich. L. Rev. 512; and notes, 24 Cal. L. Rev. 184; 19 Cal. L. Rev. 448; 15 Cal. L. Rev. 408.

The strongest cases in favor of respondents are *Van Winkle* v. *Fred Meyer, Inc.,* 151 Or. 455 [49 Pac. (2d) 1140], holding invalid an Oregon statute providing for marketing agreements regulating production, trade practices and prices; and *Uhden, Inc.,* v. *Greenough,* 181 Wash. 412 [43 Pac. (2d) 983, 98 A. L. R. 1181], holding invalid a somewhat similar Washington statute. While there are a number of distinctions between those statutes and our present act, we deem it unnecessary to consider them in detail, for in our opinion the California act is valid under the principles established by our own decisions and by the United States Supreme Court. Our recent decision in *Agricultural Prorate Com.* v. *Superior Court, supra,* was concerned with the Agricultural Prorate Act of 1933, which provided for limiting of *production* of agricultural commodities by proration. The declarations of purpose, the delegation of power, and the standards controlling the discretion of the commission entrusted with the administration of the act were substantially similar to those found in the present statute. Upon a review of the authorities, including the Oregon and Washington cases cited above, we held the delegation valid. The same conclusion must be drawn in the instant case.

The second contention is that by its provision for correlating state and federal regulation, the act delegates legislative power to Congress and the Secretary of Agriculture. The provision particularly criticized is that of section 5, subdivision (1), that every order, rule or regulation of the Secretary of Agriculture under the National Agricultural Adjustment Act, "heretofore or *hereafter* made", is applicable to all intrastate transactions within the state of California, "when and in so far as within the standards specified in and for this Act". It is, of course, perfectly valid to adopt *existing* statutes, rules or regulations of Congress or another state, by reference; but the attempt to make *future* regulations of another jurisdiction part of the state law is generally held to be an unconstitutional delegation of legislative power. (See *In re Burke,* 190 Cal. 326 [212 Pac. 193]; *Santee Mills* v. *Query,* 122 S. C. 158 [115 S. E. 202]; and note, 34 Colum. L. Rev. 1077, 1084.)

We do not believe it appropriate to consider whether section 5 of the act constitutes an unlawful delegation of power in this respect, for the reason that this section is not involved in the proceedings herein. There has been no attempt to declare or enforce any federal regulation as our law merely by reason of its promulgation by federal authority. The proceedings here were taken under section 6a of the act, and under said section, as pointed out above, the director himself must make the regulation, and must himself issue the license. And it is not provided that he must without question issue the license whenever a federal regulation of the same commodities exists, and in the same terms. On the contrary, he must hold a hearing to determine whether the federal regulations tend to carry out the purposes of the California act, and conform to its standards. Only if he first makes this finding is he to issue a similar license, and even then he is authorized and required to make such changes as are necessary to confine the regulation to intrastate commerce. There is, therefore no automatic incorporation by reference of future federal laws, but a declared policy of making our law correspond with federal regulation under circumstances set forth in our statute, and an adequate, constitutional means for carrying that policy into effect. The decisions upholding the so-called retaliatory license or tax measures, in which some foreign law is the contingency upon which they become operative, are ample authority for the present legislation. (See *People* v. *Fire Assn. of Philadelphia*, 92 N. Y. 311 [44 Am. Rep. 380]; *Clay* v. *Dixie Fire Ins. Co.*, 168 Ky. 315 [181 S. W. 1123]; note 34 Colum. L. Rev. 1077, 1085.)

The third assertion of invalidity is based upon the provision of section 6a that the director shall not enter into a marketing agreement unless it is assented to in writing by persons engaged in the industry, according to the requirements of the corresponding federal marketing agreement. It is argued that under the federal statute, section 8a, provision is made for the approval of 80 per cent of such persons, and respondents contend that there is therefore, a delegation of authority to a majority group, or even a minority group where 80 per cent of the industry may be represented by a cooperative marketing association. The cases principally relied upon in this connection are *Van Winkle* v.

*Fred Meyer, Inc.,* 49 Pac. (2d) 1140, *supra,* and *Gibson Auto Co.* v. *Finnegan,* 217 Wis. 401 [259 N. W. 420].

A simple answer is that the statute does not require a state marketing agreement as a prerequisite to a state *license,* and the director has power to make a license effective without any such approval. It is the federal regulation that is important, and that must be followed by the director, where not in conflict with the standards of our own law, regardless of approval or disapproval of any marketing agreement. ■

But irrespective of this fact, a statute is not invalid merely because it provides for consent of interested persons to the contemplated regulation. Local option statutes are obvious examples. (See *Ex parte Beck,* 162 Cal. 701 [124 Pac. 543].) The federal statute, as already pointed out, contains a provision for approval of producers or handlers, and no constitutional defect was found therein by the federal district court for the Southern District of California. (*United States* v. *Edwards,* 14 Fed. Supp. 384.) A similar provision for approval is found in our Prorate Act, upheld in *Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. (2d) 550 [55 Pac. (2d) 495]. The Wisconsin case of *Gibson Auto Co.* v. *Finnegan, supra,* was decided on the theory that the power to *initiate* the legislation establishing rules of fair competition had been delegated to private persons, a majority of a trade or industry. A later amendment of the statute, vesting the power to declare the regulations in the state executive, was held to cure the defect. (*In re State ex rel. Attorney-General* (Tavern Code Authority), 220 Wis. 25 [264 N. W. 633, 635]; see notes, 11 Wis. L. Rev. 430; 24 Georgetown L. J. 1019.) The same defect was the basis of the decision in *Van Winkle* v. *Fred Meyer, Inc., supra,* and this case is consequently readily distinguishable from the instant case.

■ Another ground of attack by respondents is that our statute necessarily presupposes the existence of a constitutional federal statute and valid regulations established thereunder; that the federal Agricultural Adjustment Act has been held unconstitutional; and that the attempted adoption of regulations corresponding with illegal federal orders is invalid.

Section 20 (a) of the California act provides that it shall remain in force "while there exists any federal regulation of any agricultural business". There is now, in fact, such

federal regulation. The case of *United States* v. *Butler*, 297 U. S. 1 [56 Sup. Ct. 312, 80 L. Ed. 477, 102 A. L. R. 914], relied upon by respondents, held unconstitutional the processing taxes sought to be collected under the federal Agricultural Adjustment Act as part of the plan of crop control. The court confined its opinion to the provisions of the act then before it. Until the federal courts have finally determined the scope of the decision in the Butler case, we are bound to presume that the present acts of federal officials under federal law are valid, based as they are upon provisions of the statute different from those under review in the Butler case. It is true that in *United States* v. *David Buttrick Co.*, 15 Fed. Supp. 655, the federal district court in Massachusetts held that the entire Agricultural Adjustment Act fell as a result of the Butler case; but the opposite conclusion was later reached by the federal district court in California in a subsequent hearing in the case of *United States* v. *Edwards*, 16 Fed. Supp. 53 (see, also, 14 Fed. Supp. 384, *supra*), affirmed, *Edwards* v. *United States*, (C. C. A.) July 22, 1937. In that case the court held the provisions for regulation of marketing in interstate commerce severable from the rest of the statute, and a proper exercise of the commerce power. We therefore are of the opinion that we cannot declare the federal regulations void, and it is entirely proper to correlate our regulations with them.

The final assertion by respondents that the allotments are sometimes so small as to make it difficult to operate their businesses, merely describes the occasional individual inconvenience that comes from regulation of a group, and it does not present any serious question of constitutionality.

None of the objections to the statute is sound, and it was therefore improper to enjoin the applicants from carrying its provisions into effect in the manner hereinabove described.

Let a peremptory writ of prohibition issue as prayed.

Curtis, J., Seawell, J., Shenk, J., and Edmonds, J., concurred.

Thompson, J., dissented.