Middleton, J.,
dissenting. The very foundation upon which the majority opinion rests is the assumed validity and constitutionality of Sections 9660-1 and 9660-2, General Code. The reasoning of the opinion fails with demonstrated unconstitutionality of those sections. There can be no question that the old shareholders are deprived of approximately $400,000 of assets. If so deprived through application of an invalid *156 statute the result is denial without due process of law.
The conversion of Security Savings & Loan Company, hereinafter referred to as “Security,” into a federal savings and loan association was undertaken pursuant to the assumed authority granted in Sections 9660-1 and 9660-2, General Code. If those sections are not constitutional, they of course contain no authority for the attempted conversion. Do those sections constitute an attempt to delegate legislative power to a federal agency such as would result in invalidity of the statutes ?
The sections of the Code here under discussion appear in Chapter 1 of Division IV entitled “Building and Loan Associations.” Section 9647 which appears in that chapter provides:
“Such corporation shall have all the powers set forth in the following sections of this chapter.”
Among the “following sections” are Sections 9660-1 and 9660-2. Section 9660-1 purports to authorize a building and loan association organized under the laws of Ohio “to.become a member of, acquire stock in and deposit money with a federal home loan bank created by act of Congress of the United States, entitled ‘An Act to Create Federal Home Loan Banks, to Provide for Supervision Thereof, and for Other Purposes, ’ approved July 22, 1932, and amendments thereto, including the Home Owners’ Loan Act of 1933, or by supplements to said acts and laws of the United States enacted in substitution therefor, and to do everything required of or authorized or permitted by the provisions of said acts and laws to members of a federal home loan bank created therein, including among other things, conversion into a federal savings and loan association, as authorised thereby and pursuant to any rules and regulations prescribed or which may hereafter be prescribed by virtue of and in ac *157 cordance with said acts and laws; but such conversion shall be made only in the manner and subject to the conditions provided in Section 9660-2 of the General Code.” (Emphasis supplied.)
Section 9660-2, General Code, then purports to authorize such Ohio corporation “to convert itself into a federal savings and loan association as authorised by the acts of Congress mentioned and described in Section 9660-1 of the General Code, and pursuant to the :rules and regulations prescribed by and in accor¿lance with said acts and laws, by proceeding as follows, and not otherwise.” (Emphasis supplied.)
Subsection 1 then provides for adoption of a resolution by the board of directors and notice to the shareholders of a meeting.
Subsection 2 provides:
“At such meeting a resolution to convert, as aforesaid shall be adopted as provided in the Rome Owner’s Loan Act of 1933 and amendments thereto. ” (Emphasis supplied.)
Subsection 3 provides that copies of the resolution and minutes of that meeting be filed with the Superintendent of Building and Loan Associations.
Subsection 4 requires that within eight months after the date of the holding of the shareholders’ meeting there shall be filed in the office of the superintendent two copies of the federal savings and loan association charter and a copy of the resolution showing assumption by the federal association of the debts and liabilities of the converted domestic association, and after such filing the superintendent is directed to file a copy of the federal association charter with the Secretary of State and ‘ ‘ on the day and hour of such filing, such association shall be deemed to have been converted into the federal savings and loan association evidenced by such charter, and thereupon:
*158 “ (1) The corporate powers of the association under the laws of this state shall cease to exist and its constitution and bylaws shall cease to be in force.
“(2) Its articles of incorporation shall be deemed to have been cancelled and annulled.
“ (3) All its property and assets including all of its right, title and interest in and to all property of whatsoever kind, whether real, personal or mixed, and things in action, and every right, privilege and interest then existing, belonging or pertaining to it, or which would insure to it, shall immediately without any conveyance or transfer, and without any further act or deed, be vested in and become the property of the successor federal savings and loan association.
“ (4) The power and authority of the Superintendent of Building and Loan Associations over and with respect to such association, its property and assets, shall terminate.”
This statute does not authorize the Superintendent of Building and Loan Associations of Ohio to exercise any supervisory or regulatory power with respect to such conversion or to do anything other than the purely ministerial acts of receiving and filing designated documents. Said sections of the Code do not specify the manner in which the shareholders of the Ohio association shall act and there is no provision therein for protection of minority or protesting shareholders. The procedure to be followed, the steps to be taken, the disposition of the shares held by the shareholders and the disposition of the assets of the Ohio association are to be determined solely by the provisions of the federal act to create federal home loan banks approved July 22, 1932 and amendments thereto, and the Home Owners’ Loan Act of 1933 and supplements to said acts and laws of the United States enacted in substitution therefor and pursuant to any rules and regu *159 lotions prescribed or which may hereofter be pres-scribed by virtue of and in accordance with said acts and latos.
It is manifest that neither the General Assembly nor any administrative officer or department of the government of Ohio has any control or authority over the Congress or any federal bureau authorized by Congress to adopt rules and regulations or establish policies or fix standards which must be observed and followed when the Ohio association is thus caused to “cease to exist” and its articles of incorporation are cancelled and annulled, all of its property and assets are transferred to a new corporation and the power and authority of the Superintendent of Building and Loan Associations over it is terminated.
It would seem unquestionable that these statutes would effect a complete delegation of legislative power to the Congress and to agencies created by Congress of such character as to come within the well established law declaring such delegation illegal.
The fourth paragraph of the syllabus in the case of Belden v. Union Central Life Ins. Co., 143 Ohio St., 329, 55 N. E. (2d), 629, reads:
“A legislative act may be unconstitutional upon its face, or it may be valid upon its face but unconstitutional because of its operative effect upon a particular state of facts. ’ ’
That statement suggests the propriety of surveying the effect in the instant case of the attempted conversion to a federal association pursuant to laws and regulations not adopted by the General Assembly or any administrative body of Ohio and over which neither the General Assembly nor any Ohio administrative agency has any regulative power.
The record in this case reveals the following:
The Security Savings & Loan Company was organized in 1916 and was a successful going concern *160 in 1949 when its board of directors adopted the preliminary resolution for conversion into a federal association. At that time it had 7,500 depositors. Its capital shares consisting of 1,828.34 shares were held by “180 or 190” individuals. Its total assets, according to its statement of condition at the close of business June 30, 1949, amounted to $8,812,043.62. Its total earnings per share from 1937 to June 30, 1949, were $271.94. The “rules and regulations for federal savings and loan system,” adopted by the Federal Home Loan Bank Board which purported to govern the conversion, provided in Section 202.24 (c):
“All shareholders without preference shall be given share accounts in the federal association of an aggregate value equivalent to the present value of their accounts, after provision for appropriate reserves as determined by the board.” (Emphasis supplied.)
Without any participation by the board of directors of Security the “board” (of Federal Home Loan Bank) determined the “appropriate reserves” and advised the board of Security that the sum of $135 per share would be paid to the then shareholders of Security. The balance of the assets' constituted the “appropriate reserves.”
A. C. Klumph, president of Security, who had held that office for many years and was very active m promoting the conversion, had no knowledge as to the manner in which the amount to be paid to the shareholders of $135 per share was determined. His testimony in part was:
“Q. I will ask you how the figure of $135 was arrived at, that would be paid to the shareholders as a result of this plan of conversion? A. The Federal Home Loan Bank approved the amount. That’s all I know. We sent our financial statement down, and they approved the amount of $135 a share.
“Q. Did that have any relation at all to the value *161 of the stock? A. I don’t know just what yonr question means, as to the value of the stock. That’s all the Federal Home Loan Bank would approve.”
William E. Taylor, secretary of Security, testified that the reserves determined by the Federal Home Loan Bank authorities represented five per cent of the total assets and about two per cent of the undivided profits. By applying that method of computation the reserves so determined would amount to approximately $400,000. No part of that reserve amounting to around $400,000 was included in the total amount of approximately $240,000 offered the shareholders at the rate of $135 per share.
When the old shareholders received the amount of $135 per share they ceased to be shareholders. They did not become shareholders in the new company unless they allowed the amount so received to remain in the company as a deposit upon the same basis as other deposits in which event they would hold one “share account” for each $100 of such deposit. All other depositors and borrowers would automatically become holders of share accounts on the basis of one share for each $100 of deposit or loan obligation. According to the undisputed testimony, if all the old shareholders allowed the money paid them to remain in the new association, the equal participation with them of depositors and borrowers would result in the interest in the association of the old shareholders being reduced from 100 per cent to less than 4 per cent.
The constitution of Security Savings & Loan Company contains no provision for conversion into a federal association. The only article of that constitution relating to termination of the company’s existence is article YII which is as follows:
‘ ‘ Dissolution.
“To dissolve the company, a resolution in writing *162 asking for such dissolution, signed by the stockholders representing at least a majority of the stock entitled to vote under this constitution, shall be presented at a regular meeting of the board of directors.
“The board of directors shall then call a special meeting for the purpose of considering and acting upon such resolution; and if, at such meeting, stockholders representing a majority of the stock entitled to vote under the provisions of this constitution, vote for the dissolution, the board of directors shall take the necessary steps to wind up the affairs of the company, subject to the contract rights of its borrowers and the vested rights of stockholders and in accordance with statutory requirements existing at the date such action is taken. ’ ’
This article clearly contemplates that the procedure specified in the General Code shall be followed in case of dissolution and those proceedings provide full protection to all shareholders and require distribution of the entire assets of the dissolved company to the shareholders — not some amount which is left after some department of the federal government has determined that approximately $400,000 (constituting approximately two-thirds of the book value of the association) shall be withdrawn and used as capital assets of a new company in which 94 per cent of the shares will be held by those who had no previous interest in the old company and who paid nothing whatever for their shares. The only provision with respect to the vote to be taken by the shareholders of Security with respect to conversion is that contained not in the Ohio law or in Security’s constitution but in federal statutes and the rules and regulations for federal savings and loan systems, which-rules provide:
“202.17. Any member of a federal home loan bank may convert itself into a federal association upon a *163 vote of 51 percent or more of the votes cast at a legal meeting called to consider such action. * * *”
At the meeting of shareholders of Security called in 1949 to consider the question of conversion to a federal association, a bare majority of the shares were voted in favor of the proposal to convert. The plaintiffs and others constituting a minority of slightly less than half the total shares of the association voted against the proposal.
The result of conversion into a federal association is that Security will “cease to exist”; its shareholders, including particularly the large minority who protested the conversion, will receive no part of the assets of Security amounting to approximately $400,000, which is denied them in order to form necessary reserves for the new company and the old shareholders have no interest in or voice in the new company except as they may elect to become ordinary depositors therein and hold share accounts on the same basis as 7,500 other shareholders — who had no interest in the old company and no right to participate in a distribution of its assets.
This, I believe, indicates that Sections 9660-1 and 9660-2, General Code, are “unconstitutional because of their operative effect upon a particular state of facts.” (Emphasis supplied.)
The law is well settled that the state legislature may not abdicate or transfer to others the essential legislative functions with which it is vested. See Beldon v. Union Central Life Ins. Co., supra, the first paragraph of the syllabus of which reads:
“The legislative power of the state is vested in the General Assembly by Section 1, Article II of the Constitution, and that body may not abdicate or transfer to others the essential legislative functions with which it is vested.”
*164 That rule of law was also applied in the case of City of Cleveland v. Piskura, 145 Ohio St., 144, 60 N. E. ((2d), 919, in which the opinion was written by Judge Bell. In that case the city of Cleveland had enacted an ordinance declaring it a misdemeanor to sell “a commodity which is the subject of a ceiling-price fixed by or under the authority of the United States of America at a price in excess of such ceiling-price so established,” and stipulating a penalty for violation.
That ordinance was held invalid for two reasons, first, because it undertook to invade a field pre-empted by Congress and, second, because it attempted to delegate legislative power to a federal agency. In the opinion Judge Bell said:
“Even assuming the ordinance to be valid upon the basis hereinbefore discussed [under the federal Constitution], it is subject to another incurable infirmity in that it unlawfully delegates legislative power to a federal agency.”
Again, in the opinion, at page 158 is the following:
“With these principles in mind we revert to the ordinance. It is therein provided that it is an offense against the city for a person to violate any commodity ceiling price fixed under authority of the Emergency Price Control Act. Such prices are determined by the Price Administrator, a federal agency, over whom council has no authority or control. That body did not and could not establish a policy or fix standards for his guidance. Therefore in the last analysis the offense is the violation of an order of the Price Administrator. Such an ordinance is invalid because of its attempted delegation of legislative power to a federal agency. ” What was expressed in the opinion was carried into paragraphs four and five of the syllabus.
*165 Numerous decisions from other states may be cited including the following:
In re Opinion of the Justices (1921), 239 Mass., 606, 133 N. E., 453. There the Senate of Massachusetts propounded to the justices of the Supreme Judicial Court the question of the validity of a proposed legislative act designed to enforce prohibition which was then in existence under the federal Constitution. The court declared the Legislature without power to pass the act. The opinion includes:
“One distinguishing characteristic of that bill is that in several sections it incorporates by reference laws made and to be made by the Congress of the United States and regulations made and to be made thereunder for the purpose of establishing offenses to be punished by fine, or imprisonment, or both, by prosecutions to be instituted in the courts of this commonwealth. * * * It is attempted by these sections and possibily by other sections to make the substantive law of the commonwealth in these particulars change automatically so as to conform to new enactments from time to time made by Congress and new regulations issued pursuant to their authority by subsidiary executive or administrative officers of the United States. * * *
“We are of opinion that legislation of that nature would be contrary to the Constitution of this commonwealth. Legislative power is vested exclusively in the General Court except so far as modified by” the initiative and referendum amendment.”
Smithberger v. Banning (1935), 129 Neb., 651, 262 N. W., 492, 100 A. L. R., 686, in which paragraphs four and five of the syllabus provide:
“4. A statute which appropriates $4,000,000 for * * * [work relief, etc.] to be expended by an administrative board, without providing rules and standards *166 of guidance and leaving the distribution of the fund among the various purposes set out in the act to the arbitrary discretion of the administrative board, is an unconstitutional attempt to delegate legislative authority.
“5. A statute appropriating $4,000,000, or so much thereof as may be required, to be expended under the terms and conditions provided by an act of the Congress of the United States to be passed in the future, is an unconstitutional attempt on the part of the Legislature to delegate legislative authority to the Congress of the United States.”
State v. Intoxicating Liquors (1922), 121 Me., 438, 117 A., 588. There the question in issue was the validity of an act of the Legislature which adopted a definition of intoxicating liquor then or thereafter declared by congressional enactment or by decision of the Supreme Court of the United States. In the opinion the court said:
“The precise question presented for our decision, therefore, is whether the Act of April 4, 1919, so far as it purports to incorporate by reference into the section thereby amended, future enactments of Congress establishing a rule, test, or definition of intoxicating liquors, and declaring such liquors to be intoxicating within the meaning of Chap. 127 of the Revised Statutes, is valid.
“We have no hesitation in answering the question in the negative. * * * such legislation constitutes an unlawful delegation of legislative power, and an abdication by the representatives of the people of their power, privilege, and duty to enact laws.”
Florida Industrial Commission v. State, ex rel. Orange State Oil Co. (1945), 155 Fla., 772, 21 So. (2d), 599, wherein the Supreme Court affirmed an award of a writ of mandamus requiring the Florida Industrial *167 Commission to refund amounts paid by an oil company for contributions under the Florida Unemployment Compensation Law upon the commissions earned by operators of bulk stations, on the theory that the bulk station operators were not employees of the oil company as defined by the Florida law. A definition of employee in the Florida act excluded employees not included within the operation of a specified section of the federal Social Security Act ‘ ‘ or amendments thereto.” With respect to this the court said:
“As to this last quoted amendment we might observe that it is within the province of the Legislature to approve and adopt the provisions of federal statutes, and all of the administrative rules made by a federal administrative body, that are in existence and in effect at the time the Legislature acts, but it would be an unconstitutional delegation of legislative power for the Legislature to adopt in advance any federal act or the ruling of any federal administrative body that Congress or such administrative body might see fit to adopt in the future. See Hutchins v. Mayo, 143 Fla., 707, 197 So., 495, 133 A. L. R, 394; 27 Va. Law Review, 1941, 700. So this last quoted amendment to the act must be confined to Title IX of the federal Social Security Act [Chapter 7, Title 42, U. S. Code] as it existed when chapter 19637 was adopted by our Legislature.”
Brock, Dir., v. Superior Court (1937), 9 Cal. (2d), 291, 71 P. (2d), 209, where in the opinion the court said:
“It is, of course, valid to adopt existing statutes, rules or regulations of Congress or another state, by reference; but attempt to make future regulations of another jurisdiction part of state law is generally held to be an unconstitutional delegation of legislative power. ’ ’
*168 The prohibition against delegation of legislative authority by state legislative bodies also applies with respect to the Congress. This is illustrated by the case of Knickerbocker Ice Co. v. Stewart (1920), 253 U. S., 149, 64 L. Ed., 834, 40 S. Ct., 438, 11 A. L. R., 1145, where a bargeman while doing work of a maritime nature was drowned in the Hudson River. The question was whether an award to the widow could be granted under the Workmen’s Compensation Law of New York, even though the cause was within maritime jurisdiction. It was contended that an act of Congress passed in 1917 had the effect of extending the maritime jurisdiction to include the rights and remedies of claimants under the Workmen’s Compensation Law of New York. The act purported to vest in the United States Courts jurisdiction “of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it, and to claimants the rights and remedies under the workmen’s compensation law of any stated’ (Emphasis supplied.)
Concerning this effort to delegate legislative power to the states, Mr. Justice McReynolds in the opinion said at page 164:
“To say that because Congress could have enacted a compensation act applicable to maritime injuries, it could authorize the states to do so as they might desire, -is false reasoning. Moreover, such an authorization would inevitably destroy the harmony and uniformity which the Constitution not only contemplated but actually established- — it would defeat the very purpose of the grant. See Sudden & Christenson v. Industrial Accident Commission, 188 Pac. Rep., 803.
“Congress cannot transfer its legislative power to the states — -by nature this is nondelegable. In re *169 Rahrer, 140 U. S., 545, 560; Field v. Clark, 143 U. S., 649, 692; Buttfield v. Stranahan, 192 U. S., 470, 496; Butte City Water Co. v. Baker, 196 U. S., 119, 126; Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S., 194, 214.” See, also, State of Washington v. W. C. Dawson & Co., 264 U. S., 219, 68 L. Ed., 646, 44 S. Ct, 302.
The general rule as to the inability of a legislative body to delegate its powers is well stated in 1 Cooley’s Constitutional Limitations (8 Ed.), 224, and that statement is annotated by reference to a great number of court decisions.
It avails nothing to argue that the rights of the shareholders of Security were subject to the (invalid) provisions of Sections 9660-1 and 9660-2, General Code, because those sections were enacted prior to 1943 in which year Security bought the assets of a small loan company known as The Ohio Mutual Savings & Loan Company and that company was “merged into” the Security Savings & Loan Company. Those two companies were not consolidated. They were merged pursuant to Section 8623-72, General Code. See Roessler v. Security Savings & Loan Co., 147 Ohio St., 480, 72 N. E. (2d), 259. The record contains a copy of the “merger agreement” between the two companies. The shareholders of Ohio Mutual were paid $40 per share for their stock and it was cancelled. They ceased to be shareholders. There was no change whatever in the purpose, or capital structure of Security. Its shareholders remained holders of the same shares in Security as before the merger and with no change in the character or conditions of those shares. The constitution and bylaws of Security remained unchanged. In other words, the Ohio Mutual was “merged into” Security and Security remained the same company. The “merger agreement” became *170 technically its amended articles but a new company did not come into existence and the rights of its shareholders were not changed.
It is well known that merger of one or more corporations into another corporation, which continues to exist, is frequently effected rather than consolidation because of the many benefits which result from the continued and undisturbed existence of the corporation into which the merger is effected. See 1 Davies Ohio Corporation Law, 948 et seq.
Although the merger of Ohio Mututal into Security in 1943 is not in any sense of controlling importance in this case, it has received considerable attention in the majority opinion. The following comments are, therefore, added as pertinent observations.
Even if it were to be held that the shareholders of Security, by filing “amended articles” of incorporation in 1943 as required by statute to reveal the manner in which it had absorbed The Ohio Mutual Savings & Loan Company, consented to and became bound by the statutes authorizing conversion into a federal association which statutes had been passed in 1934, it still could not be said that shareholders thus became bound by amendments, changes and revisions of the acts of Congress passed and regulations of federal agencies adopted subsequent to 1943 and prior to the attempted conversion in 1949. The Home Owners’ Loan Act of 1933 was amended in some respects in 1947 and again in 1948. The regulations issued by the Federal Home Loan Bank Board, under which federal savings and loan associations were organized, operated and controlled and to which a converted state association became subject, were revised several times and very extensively between 1943 and 1949. The enactment of the Federal Administrative Procedure Act in 1946 occasioned very extensive changes in sections 200.1 to *171 207.12 of the Federal Home Loan Bank Board rules and regulations with respect to federal savings and loan associations. Again in 1947 there were extensive changes in those rules including some changes in charter K which was the charter required for adoption in 1949. This merely demonstrates that the laws, rules and regulations which were followed and which controlled federal savings and loan associations and conversion of state associations into federal associations in 1949 were not the same as those in effect in 1943 and also demonstrates the very sound reasons for condemnation of statutes which purport to adopt future enactments of some other legislative body.
Toward the end of the majority opinion a position is taken, not previously expressed therein. It is that in Sections 9660-1 and 9660-2, the General Assembly merely imposed conditions and limitations on the exercise of the power to convert into a federal association. This is obviously a labored effort to find some valid defense for that section. A mere reading of those sections should convince anyone that their effect is not to impose conditions and limitations such as are discussed in the cases cited in that paragraph of the majority opinion. The only significant legislative enactment in the sections is authorization of an Ohio building and loan association “to convert itself into a federal savings and loan association.” At that point the valid legislation ceases, and the legislative body of Ohio abdicates and leaves every vestige of the law with respect to conversion to enactments by Congress and rules and regulations of federal agencies past, present and future.
None of the cases cited in that paragraph of the opinion supports the constitutionality of an act such as that embodied in Sections 9660-1 and 9660-2, General Code, as will be observed by the most casual in *172 spection of them. At the risk of undue length of this dissent I shall quote from just one of the cited cases. It is Cincinnati, Wilmington and Zanesville Rd. Co. v. Commissioners of Clinton County, 1 Ohio St., 77, which case was decided in 1852. There the right of county commissioners to subscribe to the stock of the railroad company was conditioned upon authorization by vote of the electors of the county. This was held not to be an unlawful delegation of legislative power. At page 88 Judge Ranney spoke as follows:
“But because such discretion is given, are these, and all similar enactments, to be deemed imperfect and nugatory? It would take a bold man to affirm it. In what does this discretion consist? Certainly not in fixing the terms and conditions upon which the act may be performed, or the obligations thereupon attaching. These are irrevocably prescribed by the Legislature, and whenever called into operation, conclusively govern every step taken. The law is therefore, perfect, final, and decisive in all its parts, and the discretion given only relates to its execution. It may be employed or not employed — if employed it rules throughout; if not employed it still remains the law', ready to be applied whenever the preliminary condition is performed. The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first can not be done; to the latter no valid objection can be made.” (Emphasis supplied.)
The statement in the majority opinion that the constitutionality of Sections 9660-1 and 9660-2, General Code, was not raised in the lower courts is indeed surprising. In the very extended opinion of the judge of the Common Pleas Court the following appears:
*173 “All challenge the constitutionality of Sections 9660-1 and 9660-2, in the event the court construes such sections in such a way as to deny them the fair cash value for their stock, on the ground of the impairment of the obligation of contract * * * and of the deprivation of property without due process of law * * V’
In the opinion of the Court of Appeals the following appears:
“The constitutional issue raised by plintiffs requires but brief comment. Sections 9660-1 and 9660-2 G. C. do not impair the obligations of plaintiffs’ contracts as shareholders, nor deprive them of their property without due process of law.”
Without further extending this already too lengthy opinion to refute in detail the arguments advanced in the majority opinion, my complete answer is that Sections 9660-1 and 9660-2, General Code, are unconstitutional, and the action taken pursuant to their assumed authority results in depriving the plaintiffs of property without due process of law.
Matthias, J., concurs in the foregoing dissenting opinion.