[Civ. No. 33178. First Dist., Div. Two. Dec. 30, 1974.]

RUSSIAN HILL IMPROVEMENT ASSOCIATION et al., Plaintiffs and Appellants, v.
BOARD OF PERMIT APPEALS et al., Defendants and Respondents; WILLIAM C. HAAS & CO., INC., Real Party in Interest and Respondent.

COUNSEL

M. Laurence Popofsky, J. Chris Bensick, Heller, Ehrman, White & McAuliffe and Gary J. Near for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, Robert A. Kenealey and Burk E. Delventhal, Deputy City Attorneys, for Defendants and Respondents.

J. Ronald Pengilly, Robert L. Maines, Theodore A. Russell, Phyllis E. Andelin, Pettit, Evers & Martin and Miller, Groezinger, Pettit & Evers for Real Party in Interest and Respondent.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost, E. Clement Shute and Louise H. Renne, Deputy Attorneys General, as Amici Curiae.

OPINION

**KANE, J.**—This case involves the applicability and construction of certain provisions of the California Environmental Quality Act of 1970 and the 1972 amendments thereto ("CEQA"). (Pub. Resources Code, §§ 21000-21174.)[1]

On July 7, 1971, respondent and real party in interest, William C. Haas & Co., Inc. ("developer") filed an application for a site permit with defendant San Francisco City Planning Commission ("Commission"). The initial proposal was for 280 units of luxury housing in a single building along Lombard Street, 342 feet in height and 170 feet in length, with 340 parking spaces in a garage predominantly above grade and extending to Chestnut Street. Exercising its right of discretionary review, the Commission denied the permit application on August 12, 1971. Relying upon an August 6, 1971 memorandum prepared by the planning department ("Department"), the Commission found that "the proposed building would have a massive impact and extraordinarily detrimental effect upon the city as a whole, and upon the residents and property of the Russian Hill neighborhood." The Commission also relied upon a report entitled "Urban Design Plan," which contained general environ-

---

[1] Unless otherwise indicated, all code references are to the Public Resources Code.

mental policies for the city developed over a three-year period as an inclusion to the city's Master Plan.

On August 13, 1971, the developer appealed to the respondent board of permit appeals ("Board"). On August 26, 1971, while the appeal was pending before the Board, the Commission formally adopted the Urban Design Plan as part of the Master Plan of San Francisco. On the same date, the Commission adopted "interim controls" establishing height and bulk restrictions providing, among other things, a maximum height limitation of 300 feet. On October 15, 1971, the developer withdrew its appeal and on November 9, 1971 submitted new plans for approval by the Commission. These called for two apartment towers, each approximately 300 feet in height, containing 379 dwelling units. After additional reports by the Department, and several meetings between the developer and the Department, the Commission held a public hearing on January 13, 1972. The Commission approved the application for a site permit for two apartment towers, one 300 feet high and the other 235.42 feet high, containing 343 dwelling units. A site permit was issued by the respondent central permit bureau ("Bureau") on or about February 15, 1972, and approved by the Board on February 28, 1972. A petition for rehearing was thereafter denied by the Board on April 10, 1972. Appellants then filed their petition for writ of mandate on April 20, 1972. This appeal is from the judgment denying the requested relief.

In order to sharpen the focus on the crucial issues in this case, it is important to note several significant factors in chronological context. First of all, it is to be noted that at the time of the administrative and trial court proceedings below, there was no judicial decision holding CEQA applicable to private activities. On September 21, 1972, the California Supreme Court decided *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], directly holding that CEQA's requirement of an environmental impact report ("EIR") does, indeed, apply to private activities for which a government permit or other entitlement for use is necessary. Furthermore, the court in *Friends of Mammoth* rejected a plea that "To avoid possible hardship to parties who have relied on permits" the decision be made prospective only.

This aspect of the court's opinion prompted the introduction and passage of urgency legislation, effective December 5, 1972 (see Seneker II, *The Legislative Response to Friends of Mammoth - Developers*

*Chase The Will-O'-The-Wisp* (1973) 48 State Bar J. 127, 130). The pertinent portions of this legislation are set forth in sections 21169 and 21170, as follows:

Section 21169: "Any project defined in subdivision (c) of Section 21065 undertaken, carried out or approved on or before the effective date of this section and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before the effective date of this section notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective. Any project undertaken by a person which was supported in whole or part through contracts with one or more public agencies on or before the effective date of this section, notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective."

Section 21170: "(a) Section 21169 shall not operate to confirm, validate or give legal effect to any project the legality of which was being contested in a judicial proceeding in which proceeding the pleadings, prior to the effective date of this section, alleged facts constituting a cause of action for, or raised the issue of, a violation of this division and which was pending and undetermined on the effective date of this section; provided, however, that Section 21169 shall operate to confirm, validate or give legal effect to any project to which this subdivision applies if, prior to the commencement of judicial proceedings and in good faith and in reliance upon the issuance by a public agency of any lease, permit, license, certificate or other entitlement for use, substantial construction has been performed and substantial liabilities for construction and necessary materials have been incurred.

"(b) Section 21169 shall not operate to confirm, validate or give legal effect to any project which had been determined in any judicial proceeding, on or before the effective date of this section to be illegal, void or ineffective because of non-compliance with this division."

The conflicting contentions of the parties with respect to these two statutes is readily apparent. Respondents argue that section 21169 simply validates the site permit. Appellants counter by pointing to the plain language in section 21170, subdivision (a), precluding the shelter of section 21169 to those projects, "the legality of which was being

contested in a judicial proceeding . . . prior to . . . and which was pending and undetermined on the effective date [December 5, 1972] of this section."

It is patently obvious that the case at bench precisely fits the quoted language of section 21170, subdivision (a).

In the face of this unassailable fact, respondents attack the applicability of section 21170 on two constitutional bases - (1) violation of equal protection standards, and (2) improper delegation of legislative power. Neither assertion can be sustained.

*Section 21170, Subdivision (a), Does Not Violate*
*Equal Protection Standards*

Respondents argue that the classification based upon whether CEQA litigation was instituted prior to December 5, 1972, has no rational relationship to the purposes of CEQA. We must disagree.

The test, as respondents themselves point out, is whether the classification is based upon "some difference in the classes having a substantial relation to the purpose for which the legislation is designed." (*County of San Bernardino* v. *Way* (1941) 18 Cal.2d 647, 658 [117 P.2d 354].) Thus, they do not question the power of the Legislature to create a classification in order to accomplish the purpose for which the urgency legislation was enacted, i.e., to avoid hardship and unfairness which would be caused by a retroactive application of CEQA to projects undertaken in good faith, but under an erroneous interpretation of the law. Rather, respondents contend that the classification is based on nothing more than "a fortuitous circumstance" - whether a judicial proceeding had been commenced and was pending prior to December 5, 1972.

This argument is simply too simplistic. An analysis of the entire urgency legislation discloses without doubt that the fundamental policy of CEQA (adopted in 1970) to "Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions" (§ 21001, subd. (d)) remains the pivotal consideration. Against this overriding policy, however, the Legislature was confronted by the clear fact that many private enterprises and government agencies had acted upon the erroneous legal assumption that CEQA was inapplicable to private projects; and that principles of equity and fairness would mandate that

reasonable criteria be established to prevent the infliction of hardship.

Construing sections 21169 and 21170 together, as we must, it is apparent that provision was made to validate any project which had been approved and a permit issued prior to December 5, 1972, (§ 21169) *provided* that the legality of that project was not being contested by an appropriate judicial proceeding as of December 5, 1972 (§ 21170, subd. (a)).

It is also clear from the statute itself (§ 21170, subd. (a)), that the mere filing and pendency of a judicial proceeding as of December 5, 1972, would not destroy the validation effect of section 21169 in all cases. Thus, as to a project in which "substantial construction has been performed *and* substantial liabilities for construction and necessary materials have been incurred" in good faith reliance upon the issuance of a permit "*prior* to the commencement of judicial proceedings" validation is confirmed (§ 21170, subd. (a); italics added).[2]

In short, it is evident that the Legislature was acutely aware of the competing interests of the project entrepreneur in protecting his investment and the interest of neighbors and others in protecting their environment. It is also evident that the Legislature, by enacting the urgency measures, sought to achieve some rational accommodation between the two.

The utilization of a judicial proceeding is, in our opinion, a perfectly sensible and rational vehicle to reach the goal of fundamental fairness. Simply stated, the Legislature determined that where projects were undertaken in good faith and without being legally challenged in a court of law, principles of fairness require authority to complete the project.

On the other hand, pursuit of a project in the face of an appropriate legal action erases the element of good faith which is critical in the context of the classification created by the Legislature.

---

[2]While respondents do advance a hardship argument, there is no contention that *prior* to the commencement of this litigation substantial (or any) construction had been performed or that substantial liabilities had been incurred. In fact, it appears to be conceded that the only investment *prior* to litigation was for direct land acquisition costs, the site permit fee, and architectural expense.

*Section 21170 Is Not an Invalid Delegation of
Legislative Power*

Respondents' contention under this heading is simply misconceived. Section 21170 in no way whatever delegates or confers any legislative function to "the general public." Many laws are dependent for their execution upon the acts of private citizens. A statute is not invalid merely because it provides for implementation by the actions of the citizenry. (Cf. *Brock* v. *Superior Court* (1937) 9 Cal.2d 291, 299 [71 P.2d 209, 114 A.L.R. 127].)

*Respondent Agencies Did Not Proceed In a Manner Required by Law*

"Section 21168.5 permits a court to reverse a determination of a public agency for 'prejudicial abuse of discretion.' 'Abuse of discretion is established if the agency has not proceeded in a manner required by law.' " (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 88 [118 Cal.Rptr. 34, 529 P.2d 66].)

Having determined that the instant project was not validated by the urgency legislation (§§ 21169, 21170, subd. (a)), we reach appellants' ultimate contentions that the determination by the public agencies must be set aside for (1) noncompliance with the reporting requirements of CEQA, and (2) lack of substantial evidence.

For the reasons which we explain below, we are constrained to conclude that the respondent local agencies, in granting approval and issuance of the subject site permit, did not proceed in a manner required by law. Since this conclusion, alone, necessitates a reversal of the judgment (§ 21168.5; *No Oil, Inc.* v. *City of Los Angeles, supra*), we need not discuss appellants' second contention.

The single most important requirement of CEQA is the preparation of an EIR (*No Oil, Inc.* v. *City of Los Angeles, supra*). As pointed out by the Supreme Court in *Friends of Mammoth* v. *Board of Supervisors, supra*, "California's Environmental Quality Act of 1970 requires various state and local governmental entities to submit environmental impact reports before undertaking specified activity. These reports compel state and local agencies to consider the possible adverse consequences to the environment of the proposed activity and to record such impact in writing. In an era of commercial and industrial expansion in which the

environment has been repeatedly violated by those who are oblivious to the ecological well-being of society, the significance of this legislative act cannot be understated." (8 Cal.3d at pp. 254-255.)

Section 21100, as it read prior to its amendment, effective December 5, 1972, provided as follows: "All state agencies, boards, and commissions shall include in any report on any project they propose to carry out which could have a significant effect on the environment of the state, a detailed statement by the responsible state official setting forth the following:

"(a) The environmental impact of the proposed action.
"(b) Any adverse environmental effects which cannot be avoided if the proposal is implemented.
"(c) Mitigation measures proposed to minimize the impact.
"(d) Alternatives to the proposed action.
"(e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity.
"(f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented."

Section 21104 provided: "Prior to the making of a detailed statement, the responsible state official shall consult with, and obtain comments from, any governmental agency which has jurisdiction by law or special expertise with respect to any environmental impact involved."

In *Friends of Mammoth,* the court stated that: *"The impact report must be specially prepared in written form before the governmental entity makes its decision. This will give members of the public and other concerned parties an opportunity to provide input both in the making of the report and in the ultimate governmental decision based, in part, on that report.*

*"The report, of course, must satisfy the elements set forth in section 21100. . . .*

"The report, therefore, is to contain substantially greater analysis of the effect of the proposed activity on the environment and the possible mitigation devices and alternatives than can be achieved simply through testimony followed by a naked conclusion that the environment will not be harmed by the project." (P. 263, fn. 8; italics added.)

In *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695 [104 Cal.Rptr. 197], the court ruled that an EIR must not only meet the specific requirements of section 21100, but it must fully and adequately disclose the environmental impact of the proposed project. Moreover, "[*i*]*t should be understood that whatever is required to be considered in an EIR must be in that formal report;* what any official might have known from other writings or oral presentations cannot supply what is lacking in the report. (See *Greene County Planning Board* v. *Federal Power Com'n,* 455 F.2d 412, 420, 421.)" (*Id.* at p. 706; italics added.)

In sum, then, the two basic requirements are: (1) preparation of a written EIR satisfying the elements of section 21100, (2) disclosure of the EIR prior to the administrative decision to permit input from both the public and other agencies into both the making of the report and the governmental decision based on that report.

### CEQA's Requirements Were Not Fully Complied With

It is undisputed that in the instant case a formal, properly labeled EIR was neither prepared nor submitted by respondents. They contend, however, that both literal and substantial requirements of CEQA have been met by the following: (a) three staff memoranda by the Department dated August 6, 1971, November 17, 1971, and January 13, 1972; (b) the public hearings held by the Commission and the Board; (c) the supplemental reports and alternate designs considered; and (d) the fact that the project conformed to the environmental guidelines in the Urban Design Plan. This argument is without merit.

Contrary to respondents' argument, analysis shows that literal compliance with CEQA was not present. First, although respondents label the staff memoranda as "EIRS," this was not their purpose.[3] None of the memoranda specifically discussed or analyzed the project in terms of section 21100. Second, the January 13 report was issued on the same day that the Commission reached its decision approving the project. Although testimony was taken at the January 13 hearing, this falls far short of

---

[3]This conclusion is fortified by the most recent decision on this subject by our Supreme Court. In *No Oil, Inc.* v. *City of Los Angeles, supra,* where, as here, no formal EIR was submitted, the contention was made that "reports of the planning commission constituted a sufficient EIR." The holding of the court in that case is a clear rejection of this specific contention.

the input by the public in the making of the EIR as envisioned by the courts in *No Oil, Inc.* v. *City of Los Angeles, supra; Friends of Mammoth* v. *Board of Supervisors, supra,* and *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra.* Third, there was no compilation of all the relevant environmental data into a single formal report, a procedure which would facilitate both public input and the decisionmaking process. (Comments, *Reclaiming the Urban Environment: The San Francisco Urban Design Plan* (1973) 3 Ecology L. Q. 535, 562.)

In *Friends of Mammoth, supra,* the Supreme Court left open the question whether CEQA requirements can be satisfied by substantial rather than literal compliance (p. 263, fn. 8). Assuming *arguendo* that the doctrine of substantial compliance applies, it was not met here. Initially, it should be remembered that it was the basic position of the respondents throughout the proceedings below that the CEQA requirements did not apply at all to the project. Although their arguments before the trial court were phrased in the alternative, i.e., if CEQA did apply, its requirements were met, it can be seen that this involves the type of "post hoc rationalization" carefully scrutinized by this court in *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* and condemned in *No Oil, Inc.* v. *City of Los Angeles, supra.* Neither the criteria used by respondents nor the opportunity for citizen input was sufficient to constitute substantial compliance with the requirements of CEQA.

*The criteria used:* In the course of the proceedings below, the agencies used the Urban Design Plan, implemented by certain design guidelines and interim controls, as their criteria in evaluating the environmental impact of the project.

The Urban Design Plan is a general plan which establishes environmental policies for the growth and quality of life in the city. The plan is organized around four major topics: City Pattern, Conservation, Major New Development, and Neighborhood Environment. Each section is analyzed in terms of human needs, overall objectives, fundamental design principles, and recommended policies for public and private action.

As noted in the August 6, 1971, staff memorandum: "In the Urban Design Plan, Russian Hill is recognized as an 'outstanding and unique' area of San Francisco, characterized by 'a harmonious, balanced relationship of low, small-scale older buildings and tall, slender towers.'

The hill has a 'rich background' of 'varied and well-tended landscaping', and has 'highly detailed buildings . . . that articulate the hill.' These descriptions are contained in the portion of the Urban Design Plan on Conservation, where it is indicated that the special characteristics of Russian Hill need protection from inconsistent new development, and that special review may be required, preferably with the participation of neighborhood associations.

"In the Urban Design Plan Guidelines for Height of Buildings, Russian Hill is shown to have a prevailing height of 40 feet, with point towers in the vicinity of the top of the hill. Point towers are defined as buildings that are slender in shape with a high ratio of height to width. This concept is amplified by the Guidelines for Bulk of Buildings, which specify for Russian Hill, above a height of 40 feet, a maximum plan dimension of 110 feet and a maximum diagonal plan dimension of 140 feet. In addition to the Height and Bulk Guidelines, there are many other policies in the Urban Design Plan relating to residential development on Russian Hill and elsewhere in the city."

On April 19, 1971, the Department formulated a set of guidelines specifically aimed at the Russian Hill area, called the "Urban Design Terms of Reference for Proposed Russian Hill Housing." These terms of reference, which were based upon the Urban Design Plan, covered such design factors as height, bulk, density, number of towers, setbacks, and facade treatment. The planning staff used these terms of reference in recommending disapproval of the project on August 6, 1971, November 17, 1971, and January 13, 1972.

In addition, the Interim Height and Bulk Controls, adopted August 26, 1971, contained the following material on the Russian Hill area:

"H. *Review for Point Towers on Russian Hill*

"The review by the Planning Commission for proposed point towers in the B-3 District on Russian Hill shall take into account the principles and policies of the Urban Design Plan, and especially the following:

"1. A balanced relationship of the proposed height to that of other buildings and to the topography of the hill;
"2. Conformity to the specified bulk controls;
"3. Maintenance of a high ratio of height to width;

"4. Use of less than the maximum permitted floor area ratio;

"5. Significant spacing of towers on the hill;

"6. Respect for the scale of design of nearby buildings;

"7. Maintenance of sunlight to other properties; and

"8. Other relevant criteria, such as preservation of natural features, protection of views, color, materials, accessibility, adequacy of off-street parking, and effect upon street facades."

Elsewhere, the interim controls established a height limit of 40 feet, with a greater **height possible** in point towers after Commission review, with a **maximum limit of 300 feet**. The staff memos of November 17, 1971, and January 13, 1972, noted that since the Haas application was filed prior to August 26, "**the Commission is not directly considering it under the above criteria, but that does** not make these criteria any less appropriate to the case."

Although the above criteria led the agencies to consider a number of environmental factors, analysis shows that this consideration falls far short of that which is required by section 21100.

Appellants and amicus curiae correctly point out that the staff memoranda did not discuss several significant environmental factors including: noise, pollution, high wind velocities, the impact on open space, earthquake dangers, and the increased burden on public services, in terms of water, recreation, and waste disposal. This failure to consider the total environmental impact led, in turn, to a failure to analyze the project in terms of the remaining provisions of section 21100, i.e., unavoidable adverse environmental effects, mitigation measures, and feasible alternatives. While the final report of January 13 did suggest an alternative design, based upon the factors listed in the Urban Design Plan, it did not take into account the total environmental impact of the above listed factors.

*The input requirement:* Respondents urge that "Extraordinary community participation" occurred in the planning of the project. To the contrary, the record shows that there was little public participation in the preparation of the final January 13, 1972, memorandum. That report was submitted for Commission approval on January 13, 1972, and approved on the same day, after a public hearing. That public hearing constituted the only significant public input in the decision-making process. This limited kind of input has been deemed inadequate by the courts (*Friends*

*of Mammoth* v. *Board of Supervisors, supra; Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra* at pp. 704-705; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377]).

The preparation and submission of a formal EIR well in advance of the public hearing on the application is the only sensible and fair way in which the input requirement can be satisfied. *"One major purpose of an EIR is to inform other government agencies, and the public generally,* of the environmental impact of a proposed project [citations], and to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc.* v. *City of Los Angeles, supra;* italics added.)

The importance of the input requirement is spelled out in *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, at pages 841-842 [115 Cal.Rptr. 67]: "The policy of citizen input which underlies the act (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* 27 Cal.App.3d 695, 704-705 [104 Cal.Rptr. 197]) supports the requirement that the responsible public officials set forth in detail the reasons why the economic and social value of the project, in their opinion, overcomes the significant environmental objections raised by the public. In *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285, a case decided under the analogous National Environmental Policy Act (see *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049]; *County of Inyo* v. *Yorty,* 32 Cal.App.3d 795, 807 [108 Cal.Rptr. 377]), the court explained the policy thusly: 'Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize issues [citation] but "affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." [Citation.] Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response.'* (Italics added.) (See also *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d 695, 704-705, 708; *Portland Cement Association* v. *Ruckelshaus* (1973) 486 F.2d 375, 392-394

[158 App.D.C. 308].) *Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree.*" (Italics added.)

We conclude, therefore, that the EIR requirements of CEQA were neither substantially nor literally complied with.

### *The First Sentence of Former Section 21151 Does Not Apply to Respondents' Project*

Prior to the 1972 amendment to CEQA, the first sentence of section 21151 provided as follows: "The legislative bodies of all cities and counties which have an officially adopted conservation element of a general plan shall make a finding that any project they intend to carry out, which may have a significant effect on the environment, is in accord with the conservation element of the general plan."

In 1972, the Legislature amended section 21151, eliminating the distinction between cities with conservation elements and those without, and provided that *all* local agencies be required to file EIRs for projects which may have a significant effect upon the environment.

Respondents argue that this first sentence applies to the case at bench, and was complied with by the Commission. Their argument proceeds as follows: San Francisco has a conservation element in its general plan, consisting of that portion of the Urban Design Plan entitled "Policies for Conservation." The phrase "legislative bodies" was intended to include quasi-legislative bodies such as the Commission. The Commission's approval of the developer's application on January 13, 1972, constituted the required "finding" that the project was in accord with the conservation element of the general plan. We disagree.

The first sentence of section 21151 does not apply to San Francisco, since that city did not have an officially adopted conservation element in its general plan as of January 13, 1972. Respondents attempt to characterize the Urban Design Plan's section on Conservation as fulfilling the requirements of section 21151. A reading of the Conservation section shows, however, that it was not intended to be a part of the

comprehensive plan covering all of San Francisco's natural resources. Instead, major emphasis is placed upon the preservation and renovation of San Francisco's distinctive building designs, facade treatments, street space, preservation of historic landmarks, and protection of unique and distinctive areas.

As acknowledged by the city attorney in his brief for respondents below, "the City and County does not have any conservation element as part of a general plan." It follows that the first sentence of section 21151 does not apply to the instant case.

The judgment is reversed with directions to the trial court to issue a peremptory writ of mandate revoking the approval of the site permit.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied January 29, 1975, and the petition of all the respondents for a hearing by the Supreme Court was denied February 26, 1975.